Washington, Chief Judge:
A.H. and T.L., biological parents of minor children A.L. and Ta.L., along with the *1068 children’s aunt, E.A., challenge the trial court’s decision granting the adoption of A.L. and Ta.L. by their foster parents, R.W. and A.W. (the “W.s”), and denying E.A.’s adoption petition. This court granted the petition by appellees R.W. and A.W. for rehearing en banc, thereby vacating its original opinion in this case, In re Ta.L., 75 A.3d 122 (D.C. 2013), vacated sub nom. In re R.W., 91 A.3d 1020 (D.C. 2014), in part because this appeal raises serious concerns about our prior decision in In re K.M.T., 795 A.2d 688 (D.C. 2002), where a division of this court held that permanency goal decisions of the trial court are not appeal-able.[1] Specifically, appellants A.H. and T.L. complain that the informal process used to change the permanency goal for their family from reunification to adoption, a decision they could not challenge on appeal and one that ultimately resulted in a termination of their parental rights, violated their constitutional due process rights. In addition, appellants argue that the trial court erred in granting the W.s’ adoption petition because, in considering the competing adoption petitions, the trial court failed to give weighty consideration to the adoption petition of the biological parents’ preferred caregiver, E.A. We agree with appellants that when the Child and Family Services Agency, (“CFSA”)—the agency charged with assisting parents in their efforts to reunite with their children that have been removed from their home—requests that the trial court change the goal for the family from reunification to adoption, the parents must have the right to contest the goal change before they are forced to make a Hobson’s choice between contesting the adoption petition of a stranger or consenting to the adoption of their children by a family member. Additionally, the parents should be able to appeal such a change because it marks a point in time when the trial court has effectively authorized CFSA to transfer its support to someone else to parent the child.. Despite our ruling here today, we affirm the trial court’s decision to grant the adoption petition of the W.s because it is supported by clear and convincing evidence that at the time of the adoption hearing, the biological parents, T.L. and A.H., withheld their consent to the adoption against the best interest of the children and there was clear and convincing evidence that adoption by E.A. was not in the best interests of the children.
I. Facts
On March 24, 2008, A.L. and Ta.L. were removed from the care and custody of their biological parents, A.H. and T.L., following the arrest and incarceration of both parents for a domestic violence incident in the family’s home. The CFSA immediately assumed custody of the children, and placed them in foster care with R.W. and A.W. A.L. was sixteen months old and Ta.L. was three months old at the time. The children were both underweight. A.L. was not current on her immunizations and suffered from significant medical problems, including sleep apnea and chronic pulmonary issues as well as an eye disorder and acid reflux. Ta.L. was diagnosed with failure to thrive syndrome and had not seen a doctor since birth. A.L.’s pediatrician later testified that she was concerned that A.L., might not regularly be receiving the proper treatment required for her ailments, which could be life-threatening without treatment. *1069 Two days after the children’s removal from their biological parents’ care, CFSA conducted a Family Team Meeting[2] to identify family members who might provide a temporary placement for the children while A.H. and T.L. worked toward reunification. Two of T.L.’s sisters, K.A.R. and E.A., attended the meeting. K.A.R. indicated that she would be willing to become a kinship foster care provider for the children, and E.A. agreed to be a backup provider for K.A.-R. E.A. testified that it was her understanding that if K.A.R.’s foster care license was denied, she would be second in line to get the children as a kinship foster care provider; however, E.A. did not take any steps to become a kinship foster parent at that time.
Approximately two weeks later, K.A.-R. learned that her husband did not pass the requisite background check and, as a result, she could not be licensed to care for the children in her home. K.A.-R. told E.A. that she was unable to complete the licensing process, but reassured E.A. that the children’s permanency goal was reunification, which T.L. confirmed to E.A. a short time later. E.A. testified that because she understood the children’s permanency goal to be reunification, she did nothing to attempt to become a placement for the children. CFSA also did not make any attempts to contact E.A. and qualify her as a kinship placement.
A.L. and Ta.L. were adjudicated neglected children on May 1, 2008, because they lacked proper parental care and con-•tool and because T.L. and A.H. were unable to discharge their parental responsibilities due to their incarceration and substance abuse problems.[3] The trial court committed the children to CFSA’s custody and care, with a permanency goal of reunification with the biological parents to be achieved by May 2009.
On May 14, 2009, the trial court held a permanency hearing during which the government moved to change the permanency goal from reunification to adoption because the biological parents had not made sufficient progress' towards reunification. The trial court approved the change in permanency goal from reunification to adoption, finding that T.L. and A.H. had not: 1) complied with the trial court’s order for drug testing or participated in drug treatment; 2) regularly attended couples’ counseling; 3) consistently visited the children; 4) secured stable housing; and 5) been involved with the children’s medical care and educational services.
Less than a month later, on June 12, 2009, R.W. and A.W., who had been earing for Ta.L. and A.L. since March 2008, filed a petition to adopt Ta.L. and A.L. Shortly thereafter, E.A. was contacted by a social worker because T.L. mentioned E.A. as a placement option for the children during the May 14, 2009, change of permanency goal hearing.[4] E.A. began visiting the children in June or July 2009. Visits were moved to E.A.’s home in August 2009 where the children would visit with E.A. and their biological parents for one to two *1070 hours per week. E.A. testified that she requested more, visits with the children, but her requests were denied.
On October 9, 2009, four months after the first adoption petition was filed, E.A. filed a petition to adopt A.L. and Ta.L. At a review hearing held on November 6, 2009, A.H. and T.L. indicated they would consent to E.A.’s adoption petition because it was .in the best interest of the children to be adopted by E.A. rather than be returned to their own care. E.A, .began taking foster care classes in November 2009 and became a licensed therapeutic foster care provider in December 2009. An adoption social worker deemed E.A.’s home appropriate for children. CFSA, however, supported R.W. and AW.’s petition, citing the foster parents’ ability to provide a stable home and meet all of the children’s daily and medical needs, the children’s strong bond with the W.s, E.A.’s limited involvement in the lives of the children, and concern for the safety of the children while in E.A.’s care in terms of her ability to protect the children when their biological parents are around.
The adoption trial was held in May 2011.[5] At the time of the adoption trial, the children had been in R.W. and AW.’s care for three uninterrupted years. A.H. and T.L. explained to the court that they consented to adoption by E.A. because they wanted A.L. and Ta.L. to remain in their family. At trial, E.A. claimed that CFSA had a duty to contact her so that she could become a kinship care provider,' and that she would have had a stronger bond with the children had she been timely informed. The W.s argued that it was in the children’s best interest to be adopted by their foster family. Three experts also offered testimony during the adoption proceeding: Dr. James' Venza, who conducted an attachment study between the children and the W.s; Dr. Sheryl Frank, who conducted a court-ordered bonding study of all the parties; and Dr. Charles David Missar, who offered a critique of the aforementioned studies on behalf of A.H., T.L., and E.A.
The W.s called psychologist Dr. Venza as. an expert witness. Dr. Venza conducted a study of the attachment between the W.s and the children in March 2010, when A.L. was three and Ta.L. was two. The children had been with the W.s for two years at that point, and had been visiting E.A. weekly for approximately a year. Dr. Ven-za concluded that A.L. had a secure attachment to A.W., which is the optimal level of development, and that Ta.L. had án anxious avoidant attachment to A.W., due in part to his age.[6] Dr. Venza noted substantial growth in the children’s cognitive abilities while in the W.s’ care and predicted the children would regress cognitively if separated from the W.s. Dr. Venza concluded that the impact of removing the children from the W.s’ care would be potentially “devastating” to their long-term development, particularly given their early history of neglect, medical challenges, and developmental delays, and that the risk of permanent or irreparable harm *1071 was “clear” and “unmistakable.” Dr. Venza also concluded that the impact of the children’s separation from the W.s would not differ based on where they were subsequently placed. Dr. Venza did not, however, study A.L. and Ta.L.’s attachment to E.A.
Dr. Frank, a consulting psychologist with the Department of Mental Health’s Assessment Center and court-appointed neutral expert, also testified about a court-ordered bonding study she performed in July 2010 between the children, the biological parents, and all the petitioners. Dr. Frank largely echoed Dr. Venza’s testimony. Dr. Frank testified that the children’s relationship with their biological family was positive and that E.A. ably directed the children’s play, set appropriate limits, had a nice manner with the children, and was attuned to their needs. However, Dr. Frank concluded that A.L. and Ta.L. were “most attached” to the W.s and would suffer the greatest harm, in both the short- and long-term, if that bond were broken, and that the children’s “emotional and behavioral development” were at a “high risk of derailment.” Accordingly, Dr. Frank agreed with Dr. Venza’s assessment and recommended that the court grant the W.s’ petition.
E.A. called clinical psychologist Dr. Mis-sar as her expert witness to offer a critique of Dr. Venza’s and Dr. Frank’s assessments. Although he generally agreed with their opinions, Dr. Missar opined that Dr. Frank was not in a position to offer an opinion about the children’s attachment to any party because she had only conducted an assessment of their bonding. As for Dr. Venza’s evaluation, Dr. Missar found the primary limitation to be that he did not assess the children’s attachment to their biological family, including E.A. However, Dr, Missar agreed with Dr. Venza’s testimony concerning the importance of attachments in child development and agreed ■that “severing a child’s strong primary attachment to a caretaker poses significant risks of short- and long-term harm to the child—risks that are more severe than the loss of a sense of family identity occasionally experienced by an adopted child.” Dr. Missar testified that these short-term risks include “behavioral regression,” “signs of withdrawal, signs of anxiety, [and] signs of depression,” while long-term risks include “a lack of trust in others ... as well as some on-going problems with depression and anxiety.”
On August 31, 2011, the trial court granted R.W. and AW.’s adoption petition over E.A.’s adoption petition. The trial court stated that it gave “weighty consideration” to the biological parents’ preference for E,A, to adopt A.L. and Ta.L., but that evidence presented at trial clearly established that the children’s primary attachments were to the W.s, not E.A. The trial court concluded that given the limited time the children had spent with E.A and their birth parents in the past three years, it was “inconceivable that the children [had] meaningful attachments to any of them.” On the basis of the three experts’ testimony—which the trial court regarded as “very persuasive”—the trial court found that a disruption of the attachments would pose a significant risk that all or most of the progress of the past three-plus years would be lost and that the children would regress to their pre-removal developmental trajectories. Although the trial court found E.A. to be a “forceful, healthy, and competent person” and stated that it “[did] not doubt her fitness as a caretaker for Ta.L. and A.L.,” the trial court found the risk to the children’s progress too great if the continuity of care provided by the W.s and the children’s attachment to the W.s was not maintained. In its analysis, the trial court assessed the relevant statutory termination of parental rights factors set out in D.C. Code § 16-2353 (b) and concluded that A.H. and T.L. were withhold- *1072 mg their consent to adoption by the W.s contrary to the children’s best interests and that placement of the children with E.A. was not in the children’s best interests.
II. Legal Standards
The Supreme Court has long recognized the fundamental right of parents to raise their children.[7] Even when parents have not been “model parents” or the state has temporary custody of their child, parents retain their “fundamental liberty interest ... in the care, custody, and management of their child” and have a “critical need for procedural protections[.]”[8] This court has held that because the Constitution protects a biological parent’s liberty interest in preserving a relationship with his or her child, any “state intervention [into that] relationship is subject to constitutional oversight.” In re T.J., 666 A.2d 1, 12 (D.C. 1995) (citing In re Baby Boy C., 630 A.2d 670, 673 (D.C. 1993)). The state “must provide the parents with fundamentally fair procedures.”[9]
“Absent termination of parental rights or some other finding that the parents should no longer be permitted to influence the child’s future, the parents’ rights necessarily include the right to consent, or withhold consent, to the child’s adoption.” In re T.J., 666 A.2d at 12. However, under our current adoption statute, a court may grant a petition for adoption without the consent of the natural parent if it finds by clear and convincing evidence that the consent is being withheld contrary to the best interest of the child. See D.C. Code § 16-304 (e) (2012 Repl.). Because granting an adoption without the natural parent’s consent necessarily terminates the parent’s rights, the court must weigh the same statutory factors listed in D.C. Code § 16-2353 (b) that are considered in a termination of parental rights (“TPR”) proceeding[10] to decide whether termination is in the child’s best interest. See In re S.L.G., 110 A.3d 1275, 1285 (D.C. 2015).
Where there are competing adoption petitions' and the biological parents have consented to adoption by one of the petitioners, “before rejecting the designated custodian’s petition and severing the child’s relation with his parent .., and other relatives ... the trial court must *1073 find by clear and convincing evidence both that the custody arrangement chosen by the [parents] would clearly not be in the best interest of the child and that the parents’] consent to adoption is withheld contrary to the child’s best interest.” In re T.J., 666 A.2d at 11 (citing In re J.S.R., 374 A.2d 860, 864 (D.C. 1977)). Thus, the clear and convincing evidence standard applies both when determining whether the parents’ consent to adoption can be waived under § 16-304, and when considering whether granting custody to the parent’s preferred caregiver is contrary to the best interest of the child. See In re C.A.B., 4 A.3d 890, 901 (D.C. 2010).
“We review the trial court’s order granting an adoption for abuse of discretion, and determine whether the trial court ‘exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.’ ” In re T.W.M., 964 A.2d 595, 601 (D.C. 2009) (quoting In re T.J., 666 A.2d at 10). We then assess whether the trial court applied the correct standard of proof, and “evaluate whether the [trial court’s] decision is supported by ‘substantial’ reasoning, ... ‘drawn from a firm factual foundation’ in the record.” In re D.I.S., 494 A.2d 1316, 1323 (D.C. 1985) (quoting In re R.M.G., 454 A.2d 776, 790 (D.C. 1982)).
III. Appellate Review of Permanency Goal Changes From Reunification to Adoption
Before we turn to the merits of this appeal, we must first address whether the constitutional rights of biological parents to raise their children are effectively protected under the statutory scheme currently utilized in neglect cases, and whether our decision to preclude review of permanency goal changes in In re K.M.T. undermines those rights. Our dissenting colleagues disagree with our decision to address the appealability of decisions which change the permanency goal in neglect cases from reunification to adoption in this appeal. Post at 1090-91. They contend that the issue is not properly before us because the natural parents failed to preserve the issue in the trial court. While we agree that this issue was not raised below we believe that the issue is ripe for consideration. In re K.M.T. effectively precluded a timely challenge to the permanency goal change and, therefore, no party will be unfairly prejudiced by our review. We have repeatedly affirmed our discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law, ... the factual record is complete, and a remand for further factual development would serve no purpose. See Pajic v. Foote Prop., LLC, 72 A.3d 140, 145-46 (D.C. 2013) (quoting District of Columbia v. Helen Dwight Reid Educ. Found., 766 A.2d 28, 33 n.3 (D.C. 2001).[11] Thus, we are satisfied that addressing this issue at this time is not inconsistent with our case law that provides a narrow ex-céption to our general error preservation rule because the question before us is *1074 purely one of law and no further factual record is necessary.
In seeking to protect the rights of biological parents to raise their children, give full weight to the District of Columbia’s policy preference that children be placed with family members,[12] ensure that all decisions are guided by the best interest of the children over whom this court exercises parens patriae authority, and move the children to permanency within timeframes set forth in the Adoption and Safe Families Act (“ASFA”),[13] we have endorsed a process that appellants here, as well as several amici, contend significantly undermines the constitutional rights of parents to.raise their children as well as their ability to effectively challenge a trial court’s determination that they were not making sufficient progress towards reunification to warrant CFSA’s continued efforts to achieve that goal. In fact, appellants, A.H. and T.L., as well as several amici,[14] argue that our efforts to balance the respective rights of the biological parents, the children, and the prospective adoptive parents have led the court to endorse a process that actually denies the biological parents their due process rights and undermines any meaningful opportunity they may have had to challenge permanency goal change decisions that often preordain the termination of the parent-child relationship. They argue that we must first require the government to meet its burden of proving, by a preponderance of the evidence, that reasonable efforts were made to assist the parents in achieving reunification with their children, that reunification efforts failed despite the agency’s reasonable efforts, and that changing the goal from reunification to adoption is in the best interest of the children.
Specifically, appellants A.H. and T.L., as well as the amici, contend that when a trial court changes the goal of a neglect, proceeding from reunification to adoption, it informally terminates the pending neglect case and effectively puts the case on an almost unalterable path to adoption without a full evidentiary hearing or recourse to an appeal. This contention is not without support, in the record of this case and many others. In fact, it only makes sense that when a child’s permanency goal is shifted from reunification to adoption, government resources and services are also shifted away from facilitating reunification, and instead, focus on finding and supporting potential new and permanent placements for the child.[15]
While it is ostensibly possible for the biological parents to attain reunification notwithstanding a decision by the trial court to grant a permanency goal change, this very rarely occurs in practice. See, e.g. In re G.A.P., 133 A.3d 994 (D.C. 2016); In re W.D., 988 A.2d 456, 458-59 (D.C. 2010) (goal change from reunification to adoption led to grant of foster parent adoption); In re F.W., 870 A.2d 82, 87-88 *1075 (D.C. 2005) (affirming trial court’s decision to grant petition for adoption). More often, the parents’ efforts to build or maintain a positive relationship with their child is severely hampered by the trial court’s permanency decision and by the time a parent is given the ability to challenge that decision, the passage of time and the child’s resulting attachment to the custodial adoption petitioner tends to make the granting of the adoption petition and the conser quent termination of parental rights a fait accompli. See, e.g., In re R.E.S., 19 A.3d 785, 791 (D.C. 2011); In re An.C., 722 A.2d 36, 40 (D.C. 1998); In re D.R.M., 570 A.2d 796, 806 (D.C. 1990).
It is quite possible that this court’s distaste for terminating parental rights without a viable alternative permanent living situation for the children is what led us to endorse this TPR by adoption practice in the first instance. However, we now recognize that the parents’ right to timely challenge the effective severing of their relationships with their children is too important a right to sacrifice to achieve some marginally greater efficiency in moving children to permanency, In sum, we hold that a trial court’s grant of a permanency goal change from reunification to adoption over the parents’ objection, without an adjudicatory hearing to determine whether the District has fulfilled its duty to expend reasonable efforts to reunify the family, violates a parent’s procedural due process rights and, therefore, is appealable by the parents as a matter of right.
The District of Columbia is among the few' remaining jurisdictions that do not permit appeals of permanency goal changes from reunification to adoption in neglect proceedings. Indeed, a vast majority of jurisdictions allow appellate review of goal changes either as appeals as of right of interlocutory appeals,[16] In In re K.M.T., this court departed from the norm in- our sister jurisdictions, holding that permanency goal changes are not among the orders and judgments with the “finality” necessary to warrant the right of appeal. In re K.M.T., 795 A.2d at 690.
This court has jurisdiction over all “final orders and judgments” of the Superior Court. D.C. Code § 11-721 (a)(1) (2012 Repl.). An order is not usually final unless it completely resolves the case on its merits;[17] but, to be final, an order need not necessarily be the last one in a proceeding. See District of Columbia v. Tschudin, 390 A.2d 986, 988 n.1 (D.C. 1978). In the context of neglect proceedings, we have held that orders modifying visitation, and restoring physical custody, are “final orders” for purposes of appeala-bility; however, we have held that a change of permanency goal is merely a step towards the termination of parental rights or an adoption and is not final, and thus not appealable. See In re K.M.T., 795 *1076 A.2d at 690 (citing In re DM., 771 A.2d 360, 366 (D.C. 2001)).
In holding that a permanency goal change is not appealable, this court in In re K.M.T. reasoned that such an order “merely sets goals for the children,” and therefore, “does not affect the parents’ substantive rights in any way.” Id. at 690-91. At least with respect to goal changes from reunification to adoption, we now disagree. The decision to change the goal for a child from reunification to adoption is more than just a step in the neglect process. It is a critical point in the proceedings, one that often irreversibly dictates the result of a child’s ultimate custody disposition at a subsequent adoption proceeding. Such an order is at least as critical a change in a neglect proceeding as an order modifying visitation or restoring physical custody to one parent, for which we already recognize the right of a parent to appeal. Given that a goal change to adoption cannot be appealed under our current neglect process and, recognizing that the decision has the potential to strongly influence the outcome of a subsequent adoption proceeding, we are now of the opinion that a trial court’s decision to change the goal from reunification to adoption must be appealable to adequately protect the constitutional rights of parents involved in neglect proceedings. Therefore, we overrule our prior decision, In re K.M.T., and hold that a change in the permanency goal of a neglect case from reunification to adoption is an order subject to immediate appellate review.[18]
We do not overrule In re K.M.T. lightly and recognize that such a decision will have a significant impact on the process currently used by trial courts in making permanency goal decisions. Because trial court decisions that change goals from reunification to adoption will now be appealable, the permanency goal hearing must be conducted in a way that affords parents their due process rights. Our review of the record here, as in many other neglect cases, indicates that trial courts are routinely presented with information contained in the government’s permanency report without any testimony from those who provided the information on which that the government’s recommendations are based or any other evidence that undergirds the findings and/or conclusions found in those reports. While a report of this kind may be sufficient for a typical neglect review hearing, it does not pass due process muster when the rights at stake are as great as a parent’s constitutional right to raise his or her child.
It is also important to recognize that permanency goal hearings are required by ASF A. Concerned that too many children were languishing in foster care, Congress sought to increase the number of adoptions so children could be moved more quickly into permanent homes.[19] However, in so doing, Congress recognized the need to strike a balance between pursuing this goal and preserving the right of families to *1077 remain intact. In fact, as a condition for obtaining federal funds to support their foster care programs, ASFA requires participating states to expend reasonable efforts to “preserve and reunify” families “to make it possible for a child to safely return to the child’s home.” 42 U.S.C. § 671(a)(15)(B)(ii) (2012); see also D.C. Code § 4-1301.09a (b) (2012 Repl.). In this vein, the Act requires that within a child’s first twelve months in foster care, and at least every six months thereafter, state courts must hold a permanency hearing. 42 U.S.C. § 675 (5)(B), (C) (2012); see also D.C. Code § 16-2323 (a)(4) (2012 Repl.). At these periodic review points, courts must consider whether the child can be returned to the parent, 42 U.S.C. § 675 (5)(C), and must assess whether the state has expended reasonable efforts to achieve reunification and whether those efforts should continue, 42 U.S.C. § 671(a)(15)(C); see also D.C. Code § 4-1301.09a (c); D.C. Super. Ct. Neglect Rule 34 (c).[20] However, ASFA also establishes a time frame within which parents have to ameliorate the conditions that led to the finding of neglect or face the prospect of -having their parental rights terminated. Under ASFA, if a child has been in foster care for fifteen out of the preceding twenty-two months, the state is required to seek termination of the parents’ rights unless certain exceptions apply. 42 U.S.C. § 675 (5)(E) (2012). One of these exceptions is a safety valve to protect families who have not received sufficient assistance from the state: termination need not be sought if “the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child’s home, if reasonable efforts of the type described in section 671(a)(15)(B)(ii) of this title are required to be made with respect to the child.” Id.[21]
Similarly, under our neglect statute, when a child has been adjudicated neglected and remains in an out-of-home placement, a review hearing must be held every six months unless a permanency hearing was held during the preceding six months. D.C. Code § 16-2323 (a)(1). Review hearings are conducted by the court to determine whether the child is safe, and whether appropriate steps are being taken to address the needs of the child and to ameliorate the problems that led to the child being brought into the system. Nee id. § 16-2323 (b)(1)—(5). A permanency hearing not only concerns itself with the issues typically addressed at a review hearing but also requires the court to determine the permanency plan for the child, including whether, and if so when, the child will be returned to the parent(s), placed pursuant to an award of legal custody or guardianship, placed in another permanent living situation, or placed for adoption. See id. § 16-2323 (c)(2). Section 16-2323 (d) of the neglect statute sets out the obligations of the government preceding a permanency hearing in which the government recommends a goal change. See D.C. Code § 16-2323 (d). Under this provision, *1078 the government is required to submit a report to the court and the parties that addresses, the services offered to the child and the parents; any evidence that the issues that led to the neglect disposition have been ameliorated, or have worsened; and when, if at all, the child can be returned to the parent’s home.[22] Given the importance of the permanency hearing, we conclude that unless the parents are prepared to stipulate that reasonable efforts were made by the government to help the parents ameliorate the problems that led to ,the Neglect adjudication, due process requires a more formal hearing than has been afforded to parents in the past when no . such right, of appeal existed. At such a hearing, the government must produce sufficient evidence from which a trial court can find by a preponderance of the evidence that the presumption in favor of reunification has been rebutted before the goal can be changed from reunification to adoption. In other words, the government must prove by a preponderance of the evidence that it has provided the parents with a reasonable plan for achieving reuni-fieation,' that it expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected, and that the parents have failed to make adequate progress towards satisfying the requirements of that plan. If the government satisfies its burden, a change of permanency goal from reunification to adoption would be presumptively consistent with the requirement that we act in the best interest of the child.
Given AFSA’s delicate balancing of interests, it only makes sense that the primary focus of the permanency planning hearing should be on the parents’ efforts to ameliorate the conditions that led to the neglect and the District’s efforts to assist them in achieving those goals. Acting on a determination of past neglect, the District maintains custody of this child with the understanding that such custody is temporary and that it will expend all reasonable efforts to help the troubled family and to reunify the child with her parents.[23] How *1079 ever, once it is determined that the goal should be changed to adoption, the District is obligated to put forth its best effort to make that goal a reality.[24] To put a finer point on it, such goal change orders modify the fundamental terms of the custody order in the neglect proceeding and mark a critical point in time when the role of CFSA changes, from a supporter of .family reunification to an advocate for breaking up that same family. And, even though we recognize that nothing in the statute prohibits a court from establishing concurrent goals of reunification and adoption, the presumption in favor of reunification remains the primary goal of neglect proceedings with adoption as a favored alternative placement for children when efforts to reunify the family fail. Thus, a permanency goal decision that might lead to a situation that destroys-family bonds must not be given short shrift when it comes to protecting the rights of parents to raise their own children.[25]
To ensure that the government has made reasonable efforts to reunify the family, parents must have an opportunity to challenge any statements, observations, and evaluations that form the basis of CFSA’s recommendation to the court to change the permanency goal. An appropriate hearing will provide a forum where the parents can testify, under oath concerning any alleged failure on the District’s part to provide the requisite services and resources as well as their own efforts to meet the goals set forth in .the plan that was developed to promote reunification. The hearing will also enable parents to present any other evidence that they believe supports a decision to continue with reunification efforts. Based on the evidence presented at the hearing, the trial court will be able to make findings of fact and conclusions of law that will allow this court to conduct a meaningful review , of the trial court’s permanency decision and determine “whether the trial court ‘exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor.’ ” In re D.S., 88 A.3d 678, 691 n.21 (D.C. 2014) (quoting In re Baby Boy C., 630 A.2d at 673).
More specifically, before approving a permanency goal change that allows the District to divert its limited resources from reunification to adoption, the trial court (absent waiver by the parent) must ensure that a goal change is the appropriate course of action by, at a minimum, making findings that: (1) the District has in fact expended reasonable efforts to reunify the family as it is statutorily obligated to do, in accordance with 42 U.S.C. § 676 (5)(E)(iii); (2) the goals set for the parents were appropriate and reasonable; and (3) other vehicles for avoiding the pursuit of termination, ,é.g., kinship placements, 42 U.S.C.. § 676 (5)(E)(i), have been adequately explored.[26] *1080 This court will review on appeal whether the triab court has made the requisite findings to justify a goal change and whether those findings were adequately-supported by the record.[27]
Adversarial litigation of these issues followed by appellate review is further compelled where the District’s shift in support and allegiance can harm the constitutionally protected parent-child relationship, if not preordain its ultimate termination. The services and support the District provides to fragile families in the neglect system are essential to achieving their reunification goals. Presumably, the District’s intervention would not have been necessary had the parents not been facing serious challenges and lacking robust support systems; the removal of a child from her parent’s home may be an additional destabilizing force. Courts may restrict visitation, lessen parental involvement in the child’s life, and even order information about the child to be withheld from the parents. D.C. Super. Ct. Neg. R. 34 (g)(6). These changes can devastate parent-child relationships.[28] Time is of the essence, and if the District’s support for reunification was improperly withdrawn, it must be restored as soon as possible.[29]
We are well aware that this decision places an additional burden on.the Superi- *1081 or Court and, while we are confident that these permanency goal hearings can be conducted efficiently, we recognize that associate judge review of the magistrate judge order may result in some delay in moving children who have been adjudicated as neglected into permanent living situations. We are equally mindful of the potential additional delay that may occur if parents avail themselves of the right to appeal permanency goal decisions. Because of the limited scope of this court’s review, and the broad discretion enjoyed by trial courts in making permanency goal decisions, we are confident that in the vast majority of cases our review can be adequately addressed using our summary appeals process. To that end, parties involved in an appeal from a decision by the trial court to change a permanency goal from reunification to adoption are encouraged to file cross-motions for summary disposition within the time frames provided for in Rule 4 (c) of the Rules of the Court of Appeals relating to appeals from Family Court cases. In the event that this court is unable to resolve the appeal through the summary disposition process, the appeal still will be expedited consistent with our existing rules.
IV. Unfitness Requirement and the Termination of Parental Rights
In this case, neither the parents nor E.A. challenged the adoption on the basis that the trial court failed to first find that the parents, themselves, were unfit to raise their children. However, we take this opportunity to remind our colleagues on the trial court that the presumption in favor of a fit parent’s right to raise his or her children must be rebutted by a finding of parental unfitness before the trial court can make the ultimate determination to terminate a biological parent’s rights to raise his or her children.[30] The Supreme Court has recognized that the fundamental right of an individual to parent his or her child, see Stanley, 405 U.S. at 651, 92 S.Ct. 1208,[31] may not be terminated without a predicate determination, by clear and convincing evidence that the individual is unfit to parent.[32] Thus, while we have recognized the “best interest of the child” as the decisive factor in determining whether to ultimately terminate parental rights in a neglect proceeding, it is critical that the trial court make a parental unfitness determination before undertaking a “best interests of the child” analysis.[33] Here, the trial court failed to *1082 make a finding of parental unfitness and even though the parents have not raised this failure as an issue on appeal, we would be remiss in not reminding our colleagues on the trial bench of this obligation to máke an independent determination of the fitness of birth parents. ... In In re S.L.G., we recognized that “[pjarental ‘fitness’ is not a statutorily defined term in this jurisdiction” but we said that “fitness refers to the parent’s intention and ability over time to provide for a child’s wellbeing and meet the child’s needs.” 110 A.3d at 1286. We further explained that the basic inquiry is “whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child’s welfare.” Id. This approach to fitness is consistent with Supreme Court precedent. As the Court stated in Troxel v. Granville, 530 U.S. 57, 68-69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), “so long as a parent adequately cares for his or her children (i.e. is fit), there will normally be no reason for the State to interject itself into the private realm of the family to further question 'the ability of that parent to make the best decisions concerning the rearing of that parent’s children.” See also Part I of the separate opinion of Associate Judges Beckwith and Easterly in this case, concurring in part and dissenting, in part. In our opinion in In re Petition of G.A.P., we reiterated our view as to the distinction *1083 between parental fitness and the best interest of the child. “[Pjarental ‘fitness’ is not merely a restatement of the ‘best interests of the child,’ as determined by a TPR or contested adoption proceeding. ‘Fitness,’ rather, is an independent determination of parental ‘intention and ability over time,’ ... to resolve the natural parent’s capacity to ‘care for the child’ and protect. the child against ‘undue risk of harm.’” 133 A.3d at 998 (quoting S.L.G., 110 A.3d 1275,1287 (D.C. 2015)).
Because a child’s best interests are presumably served by being placed with his ' or her fit natural parent, see Troxel, swpra, a finding of parental fitness will in most cases preclude a trial court from terminating a natural parent’s parental rights, except for those truly “exceptional circumstarice[s]” where the trial court is convinced that “a continuation of the parental relationship [between ■ a fit parent and child is nonetheless] detrimental to the best interest of the child.’ ” Id. No finding was made in this case that the parents were unfit ostensibly because once they chose to support the adoption petition of E.A., as opposed to contesting the W.’s petition and seeking reunification, the trial court may have felt that such a finding was unnecessary. However, since the adoption proceeding resulted in the termination of their parental rights, had the failure of the trial court to make a fitness determination been challenged on appeal by the parents, it is likely that a remand would have been necessary.
To require less than an independent determination of parental fitness would run counter to the Supreme Court’s pronouncements in Troxel and Santosky, the express policy of the ASFA, and the underlying purpose of the neglect process, which is not to punish parents for past wrongs, but rather to rehabilitate parents and reunite children with their families. See In re S.L.G., 110 A.3d at 1286 n.24 (“While the [parental] presumption ‘is not absolute’ and ‘must necessarily give way in the face of clear and convincing evidence that requires the court, in the best interest of the child, to deny custody to the natural parent in favor of an adoptive parent,’ the question of parental fitness is almost always at the heart of any proceeding to terminate parental rights or waive a natural parent’s consent to adoption.” In re S.L.G.] 110 A.3d 1275, 1286 (D.C. 2015) (emphasis added). We acknowledge that there may be “circumstances in which clear and convincing evidence will show that an award of custody to a fit natural parent would be detrimental to the best interests of the child.” Id. (quoting Appeal of H.R. (In re Baby Boy C.), 581 A.2d 1141, 1176-79 (D.C. 1990) (Ferren, J. concurring)); but see id. at 1291 (citing the inability “to postulate a realistic factual situation where a ‘fit’ parent can be properly deprived of parental rights based on the ‘best interest of the child.’ ”) (Newman, J., concurring). Therefore, while the fitness of the parents must first be determined in any proceeding that may terminate their parental rights, if the trial court is satisfied by clear and convincing evidence that reunification of the child with the family would grievously harm the child, the presumption in favor of a fit parent raising his or her child gives way to what is in the child’s best interest. It máy be the case that trial judges are considering future harm in their assessment of parental fitness consistent with the way this court articulated the fitness test in In re S.L.G. However, without an express fitness determination it is difficult to assess whether that is in fact the case-and so the call by Judges Easterly and Beckwith for the D.C. Council to review and update our neglect and adoption statutes may *1084 prove to be helpful in this regard. Post at 1122-23.
V. “Weighty Consideration” to the Biological Parents’ Preferred Caregiver
In this case, the children’s biological parents and their aunt, E.A., whom the parents wanted to adopt their children, argue that the trial court, in granting the adoption petition of the W.s, failed to give weighty consideration to E.A.’s competing adoption petition as required by our case law. Under current law, biological parents who are unable or unwilling to raise their own children may choosé to consent to an adoption by a preferred caregiver so that their children can be raised by someone with whom they have close familial ties; We have consistently held that when parents whose parental rights are still intact choose a custodian for their children, that choice is to be given great weight when there are competing adoption petitions before the court. See In re T.J., 666 A.2d at 11. Under such a scenario, the trial court must find by “clear and convincing” evidence that the custody arrangement preferred by the parents would clearly be contrary to the best interests of the child. Id. The court’s rationale underlying this parental preference is the recognition that biological parents have a right to raise their children and, therefore, when biological parents consent to an adoption by one of the petitioners in a contested adoption proceeding, “the trial court cannot merely weigh the competing adoption petitions against one another, as if they began in equipoise.” In re K.D., 26 A.3d 772, 778 (D.C. 2011).[34] In order to recognize this parental right in a. manner that is consistent with applicable presumptions and the best interest of the child standard, our case law requires the non-favored petitioner to prove by clear and convincing evidence that placement of the children with those petitioners would be detrimental to the children’s best interest. If the non-favored petitioners meet that burden, they must subsequently prove by a preponderance of the evidence that granting their adoption petition is in the children’s best interest before the court can, waive the parents’ consent and grant the adoption. “Clear and convincing evidence is evidence “which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In re W.E.T., 793 A.2d 471, 478 n.15 (D.C. 2002) (quoting In re Estate of Soeder, 7 Ohio App.2d 271, 220 N.E.2d 547, 574 (1966)). The non-favored petitioner bears the burden of establishing by clear and convincing evidence that placing the children with the parents’ preferred caregiver would be contrary to the children’s best interest.[35] “If the trial court has not given sufficient consideration to the [biological] parent[s’] choice ... we have generally reversed the trial court’s decision.” In re A.T.A., 910 A.2d 293, 297 (D.C. 2006).
Turning to the merits of this case, we must determine whether the trial court gave weighty consideration to E.A. as the preferred adoption petitioner for the children. Thus, we have to determine whether *1085 the competing non-preferred adoption petitioners, the W.s, met their burden of proving by clear and convincing evidence that the placement of Ta.L. and A.L. with E.A. would be contrary to their best interests. This is not an easy burden to prove and at the outset, we “recognize, as we always do in such cases, that it is no small matter for a court to permit the adoption of a child over the objection of a mother [or father] who loves [her].” In re W.D., 988 A.2d at 457 (internal quotations marks and citation omitted). However, this is not a situation where the parents, themselves, are seeking reunification so the concerns raised above about protecting the rights of parents to raise their own children and the presumptions involved in that situation are not implicated here.
Here, appellants claim that Dr. Yenza’s attachment study involving the children and the W.s, and upon which the trial court primarily relied, did nothing to undermine the presumption favoring the choice of a caregiver by the biological parents because the attachment study did not also evaluate the children’s attachment to E.A.[36] As a result, they contend that there is no evidence that placement of the children with E.A. would be detrimental to the best interests of the children,[37] that E.A. would not be a fit caretaker for the children, or that E.A. would not be able to help the children transition-to her home and care. Instead,-they argue that the trial court should have “focusfed] its inquiry on the aunt’s fitness” rather than the potential harm the children would experience in being separated from their foster párente of three years. We disagree.
In granting the W.s’ adoption petition and denying the petition of E.A., the trial court issued findings of fact concerning the development of the children and relied on expert testimony concerning the closeness of the relationship the children had with the W.s and with E.A. In its July 7⅝ 2011 order, the trial court gave appropriate consideration to the relevant statutory factors set out in § 16-2353 (b) in determining that the parents were withholding consent to adoption contrary to the best interest of the child, and acknowledged in its analysis the “weighty consideration” that it gave to the parents’ preference between the competing adoption petitions.
While the trial court did not find that E.A. would be an unsuitable caregiver,[38] the trial court did find that place *1086 ment of the children with E.A. would be ■contrary to their best interests before granting the W.s’ adoption petition. The trial court’s finding was based primarily on expert testimony that the children risked short- and long-term psychological harm if their attachments to their . pre-adoptive foster parents, R.W. and A.W., were broken. While the qualities of the particular person the biological parents favor is always critical to the court’s inquiry, the primary issue the court must grapple with, as discussed infra, is whether there is clear and convincing evidence that the favored custodial arrangement, including continuation of the relationship between the natural parents and the children, would be clearly contrary to the best interests of the children. In re T.W.M., 964 A.2d at 604 (citing In re T.J., 666 A.2d at 16).
In answering that inquiry, and in addition to the attachment study prepared by Dr. Venza, the trial court appeared to rely in part on the testimony of Dr. Frank who conducted a bonding study but testified that breaking the children’s “attachment” to the W.s would harm- the children. Dr. Frank’s testimony appears to have conflated or, at a minimum, blurred the lines between the bonding and attachment studies and it is not clear whether the trial court fully recognized the misstatement. Thus, to the extent the trial court relied'on Dr. Frank’s’bonding study to make findings focused on attachment, that reliance was misplaced. While a bonding study carries some weight in an analysis of the best interest of the children, it does not carry the same weight as an attachment study, which according to the evidence presented at trial, has a strongér correlation to emotional attachment and which, if broken, could cause significant harm to the children. Therefore, while it is possible that an attachment study might adequately support a finding by clear and convincing evidence that placement of the children with someone other than the person to whom they are attached would be detrimental to their best interests, the same cannot be said for a bonding study because children can bond with more than one individual. When this case was originally before a division of this court, the panel was not convinced of the significance of the distinction being drawn between a bonding study and an attachment study and, therefore, was reluctant to rely on either one or both as adequate support for the trial court’s- decision in this case to grant the adoption petition of the W.s over E.A. who, by all accounts, also enjoyed a positive relationship with the children. Further, the panel was concerned that a “one-sided attachment study” prepared by the W.’s expert without a corresponding study measuring the attachment the children had to E.A. was not an appropriate or balanced way of measuring the harm to the children caused by removing them from the care and custody of the W.s. On en banc review, however, those concerns are no longer shared by those on the panel or our colleagues who join this part of the opinion. We are satisfied that the record supports the trial court’s finding that breaking the children’s attachment to the W.s would significantly harm them,[39] and *1087 that is especially the case now that the children have been in the W.’s care for an exceedingly long period of time.
Here, the trial court, in relying primarily on Dr. Venza’s attachment study found that A.L. had a secure attachment, and Ta.L. had an anxious avoidant attachment, to A.W. The court also credited Dr. Ven-za’s testimony that the children had a primary attachment to A.W. and that they viewed the W.s as their primary caregivers. Most importantly, Dr. Venza testified that severance of this type of attachment will necessarily cause significant harm to the children, regardless of the qualities of the person who serves as their subsequent caregiver.
In addition to the testimony by Dr. Ven-za and Dr. Frank, Dr. Missar, appellants’ expert at trial, also acknowledged the value of attachment studies and conceded that “moving children who are securely attached does carry with it some psychological risk.” Based on this evidence, the trial court concluded that there was clear and convincing evidence in the record that the custodial relationship preferred by the biological parents with an otherwise fit and suitable caregiver would clearly be contrary to the children’s best interest. Because the trial court’s conclusion is supported by our prior decisions in a line of similar'cases, we have no basis to disagree here. See, e.g., In re T.W.M., 18 A.3d 815, 821 (D.C. 2011) (holding that based on undisputed evidence that the prospective adoptee had a secure attachment to the foster parent, there was clear and convincing evidence that removing the child from the foster parents’ care would be contrary to the child’s best interests even though the parents’preferred caregiver, a relative, was fit to care for the child); In re R.E.S., 19 A.3d at 791 (approving the trial court’s reliance on the child’s lack of relationship with the preferred relatives, and the child’s clear attachment to the foster parent, in concluding that the child’s best interests were served by granting the foster parent’s adoption over the biological parent’s objection). Thus, we are satisfied that the trial court did not abuse its discretion in this case. We reiterate the great importance of stability and continuity this court has recognized in evaluating the best .interest of child. See Rutledge v. Harris, 263 A.2d 256, 257-58 (D,C. 1970) (“[A] stable and desired environment • of long standing should not lightly be set aside.”).
While the expert testimony offered by both the appellant and appellee also recognized the fact that a positive environment in E,A.’s home could have a mitigating effect on the risk of harm to the children, the attachment study and the compelling testimony of the W.s and their experts— credited by the trial court and undisputed by E.A.’s expert—convinces us that disruption of the children’s attachments with the W.s would pose “unacceptably grave” risks to the children’s short- and long-term psychological, intellectual, and social development. We are satisfied that the W.s have produced clear and convincing evidence that granting E.A.’s adoption petition would have been contrary to the best interest of the children and therefore, the W.s successfully met their burden. Thus, the trial court’s decision to grant the W.’s adoption petition over the petition filed by E.A. is supported by the evidence in the record.
*1088 VI. Conclusion
For the above reasons, we hold that: (1) permanency goal review hearings must be conducted in a manner that protects the due process rights of parents; (2) the trial court must find by a preponderance of the evidence'that the government has made reasonable efforts to help the parents achieve reunification with their children consistent with the neglect plan that was developed for that purpose before the trial court can change the goal of a neglect proceeding from reunification to adoption; (3) a change of the presumptive goal of a neglect proceeding from reunification to adoption-is an appealable final order; and (4) prior to the termination of parental rights, either through a TPR or through an adoption proceeding, a finding of parental unfitness must first be made by the trial court unless truly exceptional circumstances exist or the parents have otherwise stipulated to their continued unfitness.
Having reviewed the permanency goal review hearing in this case, we are satisfied that even had the rights discussed herein been afforded to the parents in that proceeding, including the right to appeal the trial court’s decision to change the goal to adoption, the outcome would not have been different. The government’s evidence supports a finding that it made reasonable efforts to assist the parents in meeting the requirements contained in their reunification plan. Further, there was clear and convincing evidence in the record to support the, trial court’s findings that: (1) adoption by E.A. was detrimental to the children’s best interest; (2) the biological parents were withholding consent to the W,s’ petition to adopt contrary to the best interests of the children; and (3) adoption by the W.s was in the children’s best interest.-
Thus, the judgment of the trial court is

Affirmed.

. 795 A.2d at 690 ("In the context of neglect proceedings after the court has made an adjudication of neglect, finality has generally been held to mean either a restoration of physical custody, a termination of parental rights, or an adoption. An order that is merely a step toward one of those acts is therefore not final and appealable,”).

.Family Team Meetings are "family group decision-making meetings for children in the child welfare system! ] that enable families to make decisions and develop plans that nurture children and protect them from abuse and neglect.” 42 U.S.C. § 627 (a)(3)(A) (2010); D.C. Code § 16-2312 (a-l)(l) (2012 Repl.) (Family Team Meetings in the District “solicit the input of family members, relatives, and others concerned with the welfare of the child to develop a safety plan approved by the Agency.”).

. D.C. Code § 16-2301 (9)(A)(ii)-(iii) (2012 Repl.).

. E.A. was also previously identified as a potential kinship care provider at the Family Team Meeting in March 2008.

. No effort was made to terminate A.H. and T.L.’s parental rights before this time, which would have provided the biological parents with an appealable order prior to adoption.

. In his amicus brief, Dr. Robert Marvin explains that a secure attachment "is the [healthiest and] most trusting pattern of attachment, in which a child sees the attachment figure as both a secure base and a safe haven.” An anxious-avoidant attachment, the next-healthiest type of attachment, "represents a relationship in which a child is strongly attached to the caregiver. However, the child may anxiously avoid some of the more-intimate types of parent-child interactions that are typical of children with secure attachments.”

. See, e.g., Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct, 1388, 71 L.Ed.2d 599 (1982) (acknowledging the "[Supreme] Court’s historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest”); Stanley v. Illinois, 405 U.S. 645, 651-52, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

. Santosky, 455 U.S. at 753, 102 S.Ct. 1388.

. Santosky, 455 U.S. at 754, 102 S.Ct. 1388.

. The factors, among those relevant to the present circumstances, are:
(1)the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; ...
D.C. Code § 16-2353 (b) (2012 Repl.). Other factors set out in the statute, not at issue in the present case, are whether the child was abandoned at the hospital following his or her birth; the child's opinion of his or her own best interests in the matter; and evidence of ongoing drug-related activity in the child's home environment. See id. § 16-2353 (b)(3A), (b)(4), (b)(5).

. This court only applies the exception for reviewing unpreserved issues under Pajic and Helen Dwight Reid to civil cases; the exception does not extend to criminal cases, where we apply the more rigorous plain error test under Puckett v. United States, 556 U.S. 129, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) and United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). See, e.g., Fortune v. United States, 59 A.3d 949, 954-55 (D.C. 2013) (finding plain error under Olano where the trial court failed to obtain a valid waiver of appellant’s jury trial right in a criminal case); In re Robertson, 19 A.3d 751, 760 (D.C. 2011) (applying the test from Puckett and Olano in a criminal contempt case); Otts v. United States, 952 A.2d 156, 161-62 (D.C. 2008) (applying the plain error test under Olano in a criminal, unlawful-drug-possession case).

. See 42 U.S.C. § 671 (a)(19) (2012); see also 62 Fed. Reg. 36610, 36617 (July 8, 1997).

. Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115, 2128 (1997) (amending section 475 (5)(c) of the Social Security Act, codified as amended at 42 U.SiC. § 675 (5)(c) (Supp. 1999)).

. Legal Aid Society of the District of Columbia, National Association of Counsel for Children, Center for Family Representation, Inc., Family Defense Center, and Family Law Professors Vivek S. Sankaran, Christine Gottlieb, and Martin Guggenheim.

.42 U.S.C. § 671 (a)(15)(C) (if reasonable efforts are inconsistent with the permanency plan for the child, that is, the goal has been changed to adoption rather than reunification, reasonable efforts' "shall be made to place the child in a timely manner in accordance with the permanency plan”); D.C. Code § 4-1301.09a (c) (20Í2 Repl).

. Sixteen states allow parents to immediately appeal permanency goal changes as of right (Alabama, Connecticut, Florida, Georgia, Louisiana, Maryland, Massachusetts, Montana, Nebraska, Oklahoma, Oregon, Pennsylvania, South Carolina, Vermont, Virginia, and Wyoming). Twenty-six states allow for interlocutory review of permanency goal changes, either at the discretion of the appellate court or by certification of the family court (Alaska, Arkansas, Colorado, California, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Michigan, Minnesota, Mississippi, New Hampshire, New Jersey, New Mexico, New York, North Dakota, South Dakota, Tennessee, Washington, West Virginia, and Wisconsin). See also Md. Code, Courts & Jud. Proc. Art, § 12-303 (3)(x); In re Damon, 362 Md. 429, 765 A.2d 624, 628-29 (2001) ("[A]n order amending a permanency plan calling for reunification to foster care or adoption is immediately appealable.1').

. See In re C.A.B., 4 A.3d at 897 (citing In re K.M.T., 795 A.2d at 688).

. An order changing the permanency goal from reunification to adoption, which as we have said is effectively a final order as it is unlikely that it will be changed back to reunification, cannot be compared, as the dissent attempts, to an order removing a child and placing him or her in shelter care, see In re S.J., 632 A.2d 112 (D.C. 1993), or to an order suspending visitation until a parent’s criminal charges are resolved, see In re M.F., 55 A.3d 373 (D.C. 2012), which are both temporary situations limited in time.

. H.R. Rep. No. 105-77, pt. 1, at 8 (1997) ("There seems to be almost universal agreement that adoption is preferable to [indefinite] foster care and that the nation's children would be well served by a policy that increases adoption rates.").

. In the District, CFSA is required "[a]t least 10'days prior to each review or permanency hearing ... to submit a report ... which shall include,” inter alia, ‘‘[t]he services provided or offered to the child and his parent, guardian, or other custodian.” D.C. Code § 16-2323 (d).

. Termination also need not be sought if "the child is being cared for by a relative.” 42 U.S.C. § 675 (5)(E). A third exception to a forced goal change allows the state to avoid the obligation of filing a termination petition if the "State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child.” Id.

, Section 16-2323 (d) provides, in full:
(d) At least 10 days prior to each review or permanency hearing the Division or the department, agency, or institution responsible for. the supervision of the services to the child and his parent, guardian, or custodian shall submit a report to the Division which shall include, but not be limited to, the following information:
.(1) The services provided or offered to the child and his parent, guardian, or other custodian;
(2) Any evidence of the amelioration of the condition which resulted in the finding of neglect and any evidence of new problems which would adversely affect the child;
(3) An evaluation of the cooperation of the parent, guardian, or custodian with the Division or the applicable .department, agency, or institution;
(4) In those cases in which the custody of the child has been vested in a department, agency institution, or person other than the parent;
(A) The extent to which visitation has'occurred and any reasons why visitation has not occurred or has been infrequent;
(B) The estimated time in which the child can be returned to the home; and
(C) Whether the agency has initiated or intends to initiate the filing by the Corporation Counsel of a motion requesting the termination of the parent and child relationship and any reasons why it does not intend to; ■ ’ -
(5)Any other information as may be required by the rules of the Superior Court of the District of Columbia.

. Pursuant to ASFA, the presumptive goal is reunification, and states have an obligation to expend "reasonable efforts” to help families reunify. See 42 U.S.C. § 671 (a)(15)(B)(ii); H.R. Rep. No. 105-77, pt. 2, at 12 (1997). ("[Tjermination of parental rights is such a serious intervention that it should not be undertaken without some effort to offer services to the family,”); see also D.C. Code § 4-1301.09a (b); 45 CF.R. 1356.21 (b)(2) (2001).

, -Once a goal change from reunification to adoption has been endorsed, the state assumes the obligation, to expend reasonable efforts to achieve that goal. See 42 U.S.C. § 671 (a)(15)(C); D.C. Code § 4-1301.09a (c).

. It is immaterial that a permanency goal of adoption can theoretically be changed back to reunification, When, a court orders a new permanency goal, this goal, as its name indicates, is intended to set out the District’s final plan for a child’s permanent placement. As such, it is akin to an indefinite visitation order, which we have held to be appealable because it is final unless and until it is changed. In re D.M., 771 A.2d at 365.

.In the District, placement with relatives is recognized as a preferred alternative to placement with foster -parents. In this case,, the District’s failure to follow up with E.A. at the beginning of the case led to the issue of kinship placement being unresolved at the time of the permanency goal change. We agree *1080 with the dissent that pursuant to D.C. Code § 16-2323 (c)(4) (2012 Repl.), a permanency hearing, generally, is not the appropriate time to consider kinship placements; however, that assumes other options were explored at the beginning of the removal process as required by law. See also, e.g., 29 DCMR § 6028.2 (k) (referring to the District’s "hierarchy of permanency plan options,[1]’ in the order of "[rjeturn home to parents” and "plácement with relatives”); 29 DCMR § 1642.1 ("The first priority of the foster care system shall be to maintain a child in his or her home or that of a relative.”); 42 U.S.C. § 671 (a)(19); CFSA, Permanency Planning Policy 9-11 (May 25, 2011), available at http:// cfsa.dc.gov/DC/CFSA/PubIication% 20Files/ Policy% 20Manual/Policies/Program% 20- % 20Permanency% 20Planning% 20(fi-nal)(H).pdf (CFSA's policy that "[w]hen reunification is not in a child’s best interest, adoption by kin shall be considered as a permanency goal” and "[a]doption by non-kin is an alternative permanency option when permanency with kin not in the child’s best interests.”).

.During the permanency proceeding in this case, the magistrate judge seemed more intent on resolving the goal change issue "right quick” than in making the requisite findings to support it. It is possible that the magistrate judge was prepared to rule based on information gleaned during some of the prior review hearings and was thus deciding this matter on the basis of information that is not evident in the record of this appeal. However, there appears to be a dispute of fact regarding the accuracy of the visitation records in this case, which the magistrate judge does not seem to have recognized was her obligation to resolve, observing "[njothing’s been done that proves either way ... so the goal is changed.” She also appears to not have questioned the District about its efforts, if any, to assist the children’s father with visitation after he apparently reported that he was unable to make his scheduled visitation because he was out of work and had lost his housing.

. This is so even if the permanency goal change is only to make adoption a concurrent goal with reunification. Familial relationships may be undermined when the District shifts from total support for the parent-child relationship and throws even partial support behind a competing parental candidate.

. Subsequent review at the termination stage is too late. But in any event this court’s prior decisions make clear that the District's shortcomings in expending reasonable efforts to achieve reunification of the natural family are not a proper consideration at termination proceedings. This precedent essentially treats as harmless any failure by the District to meet its obligations under ASFA. Our conception of permanency hearings addresses this deficiency by squarely focusing the trial court’s attention (and, on appeal, this court’s attention) on the adequacy of the District’s efforts to reunify the family.

. Substantive due process requires "a presumption that fit parents act in the best inter"ests of their children," Troxel v. Granville, 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and recognition that the state may not "inject itself into the private realm of the family” absent a finding of unfitness. Id. at 68-69, 120 S.Ct. 2054.

. See also Lehr v. Robertson, 463 .U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) ("[A parent's] interest in personal contact with his [or her] child acquires substantial protection under the. due process clause); In re Ko.W., 774 A.2d 296, 304-05 (D.C. 2001).

. See Santosky, 455 U.S. at 760, 768-71, 102 S.Ct. 1388 (holding that proof of unfitness must rise to the level of clear and convincing evidence before a parent’s rights could be terminated, and observing that "until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their relationship”).

.The focus on parental fitness is also reflected in the termination procedures of other states. See, e.g., In re Ann S., 45 Cal.4th 1110, 90 Cal.Rptr.3d 701, 202 P.3d 1089, 1102 (2009) (noting that as a matter of constitutional law, "some showing of unfitness is called for when a custodial parent faces termination of his or her rights. ... In that circumstance, there is no dispute that the best interest of the child would not be a constitutionally sufficient standard- for terminating parental rights” (internal quotation marks and citation omitted)); In re Five Minor Children, 407 A.2d *1082 198, 199 (Del. 1979) (citing Quilloin, 434 U.S. at 255, 98 S.Ct. 549) ("The State cannot terminate parental rights by showing it is in the best interests of the children without showing the parents were unfit”) (overruled on other grounds); In re D.T., 212 Ill.2d 347, 289 Ill. Dec. 11, 818 N.E.2d 1214, 1225-27 (2004) (explaining that Santosky requires clear and convincing evidence' of parental unfitness, and that best interests is a separate inquiry); In re Scott S„ 775 A.2d 1144, 1151 (Me. 2001) (holding that a court seeking to terminate parental rights must consider parental Unfitness before it separately considers the best interests of the child and noting that this holding “springs from the mandates of the federal ... constitution[ ]” which has made clear that "the State may not remove children from a parent's care solely on the basis of the best interests of the children”); In re Rashawn H., 402 Md. 477, 937 A.2d 177, 188 (2007) (explaining that in terminating parental rights, the Constitution requires the .state to show "that the parent is ‘unfit’ or that 'exceptional circumstances’ exist” before considering best interests of the child); Kenneth C. v. Lacie H., 286 Neb. 799, 839 N.W.2d 305, 314 (2013) (discussing constitutional constraints and noting that "there is no clear and convincing evidence that [appellant father] is presently unfit as a parent”); Inre J.J.B., 119 N.M. 638, 894 P.2d 994, 1003-04 (1995) (holding that statute establishing "abandonment” as a criterion for TPR was constitutional only because "abandonment of one’s child establishes parental unfitness”); In re Kristina L., 520 A.2d 574, 579-80 (R.I. 1987) (explaining that the Constitution requires a finding of unfitness and that "[t]he best interest of the child outweighs all other considerations once the parents have been adjudged unfit. In essence, a finding of parental unfitness is the first necessary step”); In re J.P., 648 P.2d 1364, 1376 (Utah 1982) (determining that statute providing for termination of parental rights based on the best interests of the child alone was "unconstitutional on its face” and explaining that "[u]nlike the standard of 'parental fitness,’ which imposes a high burden on the state in an adversary proceeding, the standard of ‘best interest’ of the child provides an open invitation to trample on individual rights through trendy redefinitions and administrative or judicial abuse”); Copeland v. Todd, 282 Va. 183, 715 S.E.2d 11, 20 (2011) (for a TPR statute "to pass constitutional due process scrutiny, [it] must provide for consideration of parental fitness and detriment to the child” because "the Constitution requires more than a mere showing of the child's best interests to terminate parental rights”); In re A.B., 168 Wash.2d 908, 232 P.3d 1104, 1109 (2010) (en banc) ("The first question here is whether a parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child, According to the United States Supreme Court, this court, and our Court of Appeals, the answer is yes”).

. We need not address here whether the court must give weighty consideration to the preference of a biological parent who has demonstrated utter lack of regard for, or even hostility to, the best interest of the child. In such a case, at least arguably, "the parent is not competent to make ... a decision” about a caregiver for the child. See In re T.J., 666 A.2d at 11, 16. And, in any event, it may be that, in any such cases, the burden of demonstrating that it would be clearly contrary to the child’s best interest to place the child with the parents’ preferred caregiver would not be a difficult one.

. In re T.W.M., 964 A.2d at 604 (citing In re T.J., 666 A.2d at 16).

. Appellant E.A. also contends that the trial court erred in not considering the District of Columbia’s failure to pursue a family placement with E.A. after it was determined that T.L.’s sister, K.A.-R. could not be certified as a family placement for A.L. and Ta.L. We have repeatedly held that a "child cannot be punished for the alleged wrongs of the bureaucracy.” In re L.L., 653 A.2d 873, 882 (D.C. 1995) (quoting In re L.W., 613 A.2d 350, 355 n.11 (D.C. 1992)). At this stage, which is past the permanency goal change, "the overriding consideration is the best interest of the child ... regardless of the defaults of public agencies in seeking reunification of the family.” In re A.C., 597 A.2d 920, 925 (D.C. 1991).

. As Dr. Venza testified, attachment is a dynamic process, and children can have attachments to several people at once. However, the trial court concluded that it was "inconceivable that the children had meaningful attachments to [E.A.]” given the limited time the children had spent with E.A. in the past three years.

.We emphasize again that in neglect and adoption proceedings, preservation of natural parents' constitutionally-protected right to the care, custody, and management of their child demands a strong presumption in favor of placing the child in the care of the natural parent unless the parent is first proven to be "unfit.” See In re S.L.G., 110 A.3d at 1285-86. The court "cannot constitutionally use the ‘best interests’ standard to terminate the parental right's of a ‘fit’ natural parent, and instead, grant an adoption in favor of prospective adoption petitioners simply because *1086 they are 'filter.’ ” Id. at 1287-88 (internal quotation and citation omitted). This presumption, however, does not apply in favor of a designated caregiver herself, E,A, asserts that the trial court erred in not focusing its analysis on her own fitness, but this assertion is unavailing because she is not entitled to the same presumption favoring "fit” natural parents. Instead, her designation by the natural mother as the preferred caregiver is entitled to "weighty consideration” as articulated herein.

. While attachment studies are a significant consideration in the weighty consideration *1087 analysis, we caution that there are also other important considerations for the trial court when weighing a preferred caregiver's petition for adoption with that of a non-preferred caregiver, such as the appropriateness of the preferred caregiver; preservation of extended family ties (a policy reflected in District of Columbia law); and issues pertaining to racial, cultural, and family identity, among others. See In re T.J., 666 A.2d at 5, 14.

. In re Ta.L., 75 A.3d 122, 133 (D.C. 2013), vacated, 91 A.3d. 1020 (D.C. 2014).