*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 17-FM-1302

KEITH L. CHEEK, JR., APPELLANT

V.

NICOLE EDWARDS, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DRB-116-17)

(Hon. Michael K. O'Keefe, Trial Judge)

(Submitted October 12, 2018                    Decided September 5, 2019)

*Dennis Lane*, with whom *Marcia Stanford* was on the brief, for appellant.

*Marisa C. Maleck* for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

EASTERLY, *Associate Judge*:  Appellant Keith L. Cheek challenges an order holding him in civil contempt for violating a temporary custody order, granting to appellee Nicole Edwards permanent sole legal and physical custody of their minor children, and leaving his visitation rights to Ms. Edwards's sole discretion.  Mr. Cheek does not contest the trial court's finding that he violated the temporary

custody order, but he argues that the court's decision—in the midst of his civil contempt hearing—to modify the permanent custody order (that had, by then, superseded the temporary custody order) violated his due process right to notice and an opportunity to be heard. He further argues that the modification of the permanent custody order was punitive in nature, and thus an inappropriate remedy for civil contempt. Lastly, he challenges the court's decision to delegate to Ms. Edwards the authority to regulate visitation. We reverse and remand.

## I. Facts and Procedural History

Mr. Cheek and Ms. Edwards, formerly married, have two minor children. After their divorce, they agreed to share custody, but they could not agree on where the children should primarily reside during the school year—with Mr. Cheek in the District or with Ms. Edwards in Gaithersburg, Maryland. After a three-day trial in August 2017, the trial court awarded the parties joint legal and physical custody of their children, and ordered that the children would primarily reside with Ms. Edwards. In so doing, the court found "that both of these parents love these kids incredibly much and [that] up until last January they did a pretty good job of co-parenting." The court determined the statutory considerations did not favor one side over the other, with one exception. The court acknowledged that there was evidence that Mr. Cheek had acted violently in the home and that his

commission of an intrafamily offense created a rebuttable presumption that joint custody would not be in the best interests of the children. *See* D.C. Code § 16-914(a)(2) (2012 Repl.). In light of its ultimate ruling, the court appeared to conclude, however, that that presumption had been rebutted. In its oral ruling, the court explained "even [Ms. Edwards] is saying joint custody, not sole custody. She's not saying don't let these children around Mr. Cheek[] because he is a violent person. She's saying we've had problems in the past, but I know the children love him and he still needs to be involved in their life." Instead, the court used the intrafamily offense evidence as a "tiebreaker" for its decision regarding the children's primary residence.

After the court made its oral ruling,[1] but before it issued its written Findings of Fact, Conclusions of Law and Permanent Custody Order on September 14, 2017, Ms. Edwards filed a motion for civil contempt, arguing that Mr. Cheek had violated the trial court's directive that the parties not "harass, assault, threaten, or

---

[1] Recognizing that there were special scheduling needs with the start of the school year approaching and that it might take some time before it could issue a written order, the court issued a temporary custody order (the third such order in the case) contemporaneous with its oral ruling. The temporary custody order generally mirrored its oral ruling and in particular directed that the children would reside with Mr. Cheek for the remainder of the summer, until September 3, 2017.

stalk" each other.[2] Ms. Edwards alleged that, on September 3, 2017, when she and Mr. Cheek met to exchange the children, Mr. Cheek struck her in the jaw with his fist; she provided the court with a copy of the temporary protective order she had obtained in the General District Court of Montgomery County, and she informed the court that Mr. Cheek faced criminal charges for second-degree assault. Ms. Edwards also asserted that Mr. Cheek had sent her a "deluge of unprovoked text messages demonstrating increasing hostility towards her."

Ms. Edwards asked the court to "order the following remedial relief":

- Domestic violence prevention and parenting courses for Mr. Cheek;
- A requirement in the visitation schedule that all future custody exchanges take place at a third-party location at a place of Ms. Edwards's choosing;
- In lieu of attorney's fees, $500.00 payable to Ms. Edwards to be used for psychological counseling services for the minor children; and
- Any other relief this Court deems appropriate.

In a footnote attached to the final, catchall request, Ms. Edwards cited to the trial testimony of social worker Donna Geraci, seemingly referring to Ms. Geraci's recommendation that the children continue "receiving play therapy for a period of time."

---

[2] The trial court included this directive in its Third Temporary Custody Order and again in its September 14, 2017, Permanent Custody Order.

The trial court acknowledged receipt of Ms. Edwards's motion for civil contempt in its September 14, 2019, Permanent Custody Order, but it explained that it had "not taken the Motion . . . into account at this time."  That said, the written order went beyond the court's post-trial oral ruling in two respects:  (1) it specified that "[i]f Ms. Edwards finds that the girls are reporting any subsequent instances of domestic violence at Mr. Cheek[']s home, she will have the authority to suspend visits and return to court for a hearing"; and (2) it directed that "all exchanges between [Mr. Cheek] and [Ms. Edwards] will be supervised by a non-interested third party and occur at a third-party location of [Ms. Edwards's] choosing."

About a week after it issued the Permanent Custody Order, the trial court issued a scheduling order, noting the pendency of Ms. Edwards's civil contempt motion[3] and directing the parties to appear for a hearing on October 16, 2017, to present "testimony and argument on this motion."  After issuance of the scheduling order, Mr. Cheek filed an opposition to Ms. Edwards's civil contempt motion.  He denied violating the court's directive not to "harass, assault, threaten, or stalk" Ms.

---

[3] The court also noted the pendency of Ms. Edwards's motion to seal.

Edwards and also argued that Ms. Edwards had shown "no need . . . for issuance of a sanction against Mr. Cheek to enforce compliance with the Order or that [she] has sustained any losses or damages that can be traced to the noncompliance."[4]

At the outset of the hearing on the issue of civil contempt, counsel for Ms. Edwards informed the court that she was "seeking the Court's intervention . . . to put in [ ] place a mechanism that will allow these two parents to care for their children, to be able to co-parent going forward." Counsel specifically highlighted two requested "remed[ies]" for Mr. Cheek's alleged conduct: classes regarding domestic violence and co-parenting and payment of $500 "to be used for counseling services for the children." Ms. Edwards then gave her account of the September 3, 2017, incident,[5] which she testified the children witnessed and to which they reacted negatively.

---

[4] Because he was facing criminal charges in Montgomery County, Maryland, Mr. Cheek argued that, "[t]o protect [his] Fifth Amendment rights and in the interest of comity," the court should delay any fact finding as to the alleged assault. The trial court denied this request, see *infra*.

[5] Ms. Edwards's testimony largely tracked the allegations in her civil contempt motion, but she provided more detail, stating that Mr. Cheek had tried to give her a box of chicken through the partially-rolled-down front passenger side window of her car while she was sitting in the driver's seat, leaning across the passenger's seat to speak to him; that she pushed the box of chicken back out of the car; and that he hit the left side of her face with his fist.

After hearing this testimony, the trial court asked Ms. Edwards why she had not sought to modify custody. When Ms. Edwards responded that "we were under the impression that we don't have the ability to modify it," the court asked, "what do you think is best for your kids?" Ms. Edwards said that she didn't "want to be too radical right now," but indicated that the children needed "some space to be able to heal" and that Mr. Cheek "might need some space to be able to figure out how he wants to move forward in being an effective parent to them." She reiterated that she "didn't know that we were going to be able to modify anything," that she thought "it was pretty set in stone," but then told the court "if there is room to modify it, I think they do need space to, just kind of like go to counseling, and if he could go to counseling, and everybody just heal a little bit before they start to visit with him more."

A confused exchange followed where Mr. Cheek's counsel began to argue that, because this was civil contempt, the court's focus should be on the order Mr. Cheek allegedly violated and how to bring him into compliance. Counsel noted that Ms. Edwards had been awarded tie-breaker authority about where to send the children to school and, Mr. Cheek's text messages notwithstanding, he had acceded to her wishes. The court agreed that the texts from Mr. Cheek to Ms. Edwards were "sort of a minor issue," but observed that the assault allegation was

a "major" one.  The court noted that domestic violence had been a persistent concern and expressed a (unsupported) belief, over defense counsel's objection, that it had been the reason the parties had divorced.  The court also (mis)recollected that it was the reason Mr. Cheek had been "kicked [ ] out" by his girlfriend, although the court subsequently acknowledged that it might be "thinking of another case."

After hearing limited testimony from Mr. Cheek,[6] the trial court noted that the September 14, 2017, Permanent Custody Order had given Ms. Edwards authority to "suspend visit[ation] and return to court for a hearing" if she heard the girls reporting any instances of domestic violence.  Observing "[w]ell, here we have, not just reports of domestic violence, . . . [Ms. Edwards] is the recipient of an allegation of domestic violence," it appeared to make a factual finding that Ms. Edwards had been assaulted.  Counsel for Ms. Edwards then informed the court that she had determined "it makes sense to move to modify legal custody, and perhaps revisit the issue of supervised visitation with Mr. Cheek."  The trial court stated it "ha[d] no choice" but to modify custody "based on this record."  When

---

[6] Mr. Cheek confirmed that he had met with Ms. Edwards on September 3, 2017, to drop the children off with her, but, because his criminal case in Maryland was still pending, he asserted his Fifth Amendment privilege against self-incrimination and did not provide his own narrative as to what happened.

Mr. Cheek tried to argue that there was another side to the story and that not everything Ms. Edwards had said was true, the court indicated that it credited Ms. Edwards's testimony in full, that Mr. Cheek had had an "opportunity" to be heard, and that he could "go and have [his] trial in Montgomery county[.]" The court then ruled from the bench that, going forward, Ms. Edwards would have sole legal and physical custody of the children, and Mr. Cheek's visitation rights "w[ould] be at her discretion."

After making this custody-change ruling, the court returned to the civil contempt motion and found that Mr. Cheek had both been subject to a court order "which required that there be no harassment, no assaultive behavior" and that he had violated this order, based on its assessment that there was clear and convincing, "unrebutted" evidence that Mr. Cheek had assaulted Ms. Edwards. Accordingly, the court found Mr. Cheek in civil contempt. As to remedies, the court declined to order Mr. Cheek to pay $500 towards therapy for the children, noting "[s]o, I mean civil contempt is intended to coerce compliance with [a court] order," but the court did order Mr. Cheek to reimburse Ms. Edwards for her medical costs.

The court memorialized this oral ruling in its October 18, 2017, Modified Permanent Custody Order. The court made formal factual findings that Mr. Cheek had assaulted Ms. Edwards. The court determined that Mr. Cheek was in civil contempt of the provision of its Third Temporary Custody Order that the parties not assault each other. The court then stated that it was modifying the September 14, 2017, Permanent Custody Order to give Ms. Edwards sole legal and sole physical custody of both children. The court explained it was making this change in custody for two reasons: (1) it had determined that the assault constituted "a substantial and material change in circumstances affecting the best interest of the child[ren]," noting that "[t]he inquiry is not whether such changes are in the nature of imminent danger," and (2) "[t]o sanction Mr. Cheek for his contempt and to coerce his compliance with the Court's order that he refrain from assaulting Ms. Edwards and from exposing the children to any domestic violence." As to visitation, the court "awarded" Mr. Cheek "reasonable rights of visitation at Ms. Edwards's discretion" and authorized Ms. Edwards "to commence, suspend, and structure the visitations as she deems appropriate." This appeal followed.

## II. Analysis

Our analysis begins and ends with Mr. Cheek's argument that his constitutional right to due process was violated when the trial court decided to

modify its Permanent Custody Order in the midst of a hearing on Ms. Edwards's motion for civil contempt. We review this constitutional claim de novo. *In re N.N.N.*, 985 A.2d 1113, 1118 (D.C. 2009).[7]

The Fifth Amendment of the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law." U.S. CONST. amend. V. The procedural due process guarantee requires that certain procedural protections be afforded before individuals can be deprived of their protected interests. *Richard Milburn Pub. Charter Alt. High Sch. v. Cafritz*, 798 A.2d 531, 541 (D.C. 2002). Specifically, when protected interests are implicated, due process requires adequate notice and an opportunity to be heard appropriate to the nature of the case. *See In re N.D.*, 909 A.2d 165, 171 (D.C. 2006). The Supreme Court has long recognized the fundamental right of parents to

---

[7] Ms. Edwards argues that Mr. Cheek did not preserve his due process challenge to the court's decision to change its Permanent Custody Order. Mr. Cheek indicates that he fairly brought the issue to the court's attention by reminding the court that the only issue for the hearing was Ms. Edwards's motion for civil contempt (which did not include a request to modify custody). We need not resolve this dispute. Ms. Edwards had the opportunity to and did address this issue on appeal, and in civil cases like this one, "[w]e have repeatedly affirmed our discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law, . . . the factual record is complete, and a remand for further factual development would serve no purpose." *In re Ta.L.*, 149 A.3d 1060, 1073 (D.C. 2016) (en banc).

raise their children as a protected interest. *In re Ta.L.*, 149 A.3d at 1072 (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). Applying these principles to these facts, we conclude that Mr. Cheek's due process rights were violated because he was given neither adequate notice nor an opportunity to be heard before the court reconsidered the Permanent Custody Order that had given Mr. Cheek and Ms. Edwards joint legal and physical custody of their children, modifying it to give Ms. Edwards sole legal and physical custody. *See In re J.F.*, 615 A.2d 594, 597–98 (D.C. 1992) (father denied due process where, at a hearing that was supposed to address mother's substance abuse issues, court decided to transfer custody of child from father to grandmother).

The record establishes that Mr. Cheek did not have notice that the trial court would reconsider custody at the hearing on Ms. Edwards's motion for civil contempt. First, when Ms. Edwards brought the alleged assault to the court's attention in her civil contempt motion, she did not ask for a change in custody as a remedy or a sanction for Mr. Cheek's conduct. She asked instead for a variety of other relief, including at least one remedy which implicitly accepted a continuation of joint custody: she sought a directive that "all future custody exchanges take place at a third-party location at a place of Ms. Edwards's choosing." Second, although the court knew about the alleged assault before it issued its written

Permanent Custody Order, it did not invoke its statutory authority[8] to reopen the question of custody;[9] instead it opted to issue a written permanent order granting the parties joint legal and physical custody of their children and directing not only that custody exchanges take place at a third-party location of Ms. Edwards's choosing (as she requested in her contempt motion), but also that these exchanges would be "supervised by a non-interested third party." Third, although the court's written permanent custody order also directed that Ms. Edwards could "return to court for a hearing" if the children reported instances of domestic violence in Mr. Cheek's home, Ms. Edwards did not thereafter file a written motion for a change in custody. Fourth, when the court issued its scheduling order, it directed the parties to appear only for "testimony and argument on this motion," referring to Ms. Edwards's civil contempt motion which said nothing about a change in custody. Fifth, when the parties appeared in court for the civil contempt hearing, Ms.

---

[8] *See* D.C. Code § 16-914(f)(1)(providing that "[a]n award of custody may be modified . . . on the Court's own motion, upon a determination that there has been a substantial and material change in circumstances and that modification . . . is in the best interest of the child").

[9] Certainly, the court's express statement in its written Permanent Custody Order that it was not taking into account Ms. Edwards's civil contempt motion did not put Mr. Cheek on notice that it would consider a change to the custody arrangement at the civil contempt hearing. Nor should we impute to Mr. Cheek knowledge that such a remedy was on the table if he was found in contempt, given that, as a legal matter, it is not apparent that a change in custody would satisfy either aim of civil contempt. See *infra*.

Edwards's counsel gave no indication that she sought a change of custody, representing instead that her client was "seeking the [c]ourt's intervention" to help the parties "co-parent going forward." Sixth, after the court sua sponte raised the possibility of modifying the custody order, Ms. Edwards indicated that this had not occurred to her, both because she didn't "want to be too radical" and because she had the impression that the permanent custody order "was pretty set in stone." Seventh, counsel for Ms. Edwards only moved to modify legal custody at the very end of the hearing on the contempt motion, after Ms. Edwards and Mr. Cheek had testified.[10]

To the extent Ms. Edwards argues that there was no need to give Mr. Cheek independent, express notice that the Permanent Custody Order might be modified because such a modification should have been a reasonably anticipated result of the her contempt motion, we cannot agree. Again, Ms. Edwards herself did not request custody modification as a remedy. Moreover, as Ms. Edwards acknowledges, civil contempt has a limited function "to enforce compliance with an order of the court and to compensate the aggrieved party for any loss or damage

---

[10] Counsel for Ms. Edwards never moved to modify physical custody; counsel only suggested that "perhaps" the court should "revisit the issue of supervised visitation."

sustained as a result of the contemnor's noncompliance." *D.D. v. M.T.*, 550 A.2d 37, 43 (D.C. 1988). But even now it is not obvious how a finding that Mr. Cheek assaulted Ms. Edwards justified as a remedy—either as compliance enforcement or compensation—changing the permanent custody arrangement in this case, where the parties were not cohabitating, the assault occurred during a transfer of custody that predated the issuance of the Permanent Custody Order, and the subsequently-issued Permanent Custody Order provided that, going forward, transfers of the children would be both "supervised by a non-interested third party and occur at a third party location of [Ms. Edwards's] choosing."

None of this is to say that it was inappropriate for the court to raise the issue of altering the Permanent Custody Order or for Ms. Edwards to ask the court to take this step based on Mr. Cheek's alleged conduct. *See* D.C. Code § 16-914(f)(1); *see also* D.C. Code §§ 16-914(a)(2), (a)(3)(F), (a-1). We agree that an allegation of assault within a family is a significant event vis à vis custody determinations. In fact, it is precisely because of its significance that it is all the more critical that due process guarantees be honored.

Here, in the absence of a written motion from Ms. Edwards, the court should have given Mr. Cheek advance written notice that it was sua sponte considering

modifying custody pursuant to its authority under D.C. Code § 16-914(f)(1). Mr. Cheek should have been given an opportunity to file a written opposition (as he did in response to the civil contempt motion), and to argue that there had not been a substantial and material change in circumstances and that the court's careful evaluation of the statutory factors after the August 2017 custody trial was still applicable. Mr. Cheek should have been given an opportunity to either (1) argue that, if custody of his children was at stake, the hearing should be delayed until after the resolution of his Maryland case or (2) at the very least make an informed decision whether to stand on his Fifth Amendment right not to incriminate himself or to testify about his version of his interaction with Ms. Edwards on the date of the alleged assault, a charge for which he was eventually acquitted.

Accordingly, we reverse the trial court's Modified Permanent Custody Order and reinstate the September 14, 2017, Permanent Custody Order, without prejudice to Ms. Edwards or the court on its own initiative raising the issue of modification anew based on a current assessment of the best interest of the children.[11] *See*

---

[11] Although we reverse on due process grounds, we acknowledge Mr. Cheek's discrete challenge to the trial court's order directing that his visitation with his children be at Ms. Edwards's sole discretion. Whether to grant a noncustodial parent visitation is a decision committed to the trial court's discretion and the court abuses this discretion when it delegates this decision to anyone else. *Lewis v. Lewis*, 637 A.2d 70, 72–73 (D.C. 1994); *see also id.* at 73 (directing the

(continued…)

*Lindau v. Lindau*, 286 A.2d 864, 865 (D.C. 1972) (in making custody decisions courts look to "the present welfare of the child").

*So ordered.*

---

(…continued)
trial court, "[o]n remand, [to] fashion a visitation order which reflects its ultimate retention of authority over the subject").