*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-FS-984


IN RE B.C.;
C.P., APPELLANT.


Appeal from the Superior Court
of the District of Columbia
(NEG-9-19)

(Hon. Janet Albert, Magistrate Judge)
(Hon. Darlene Soltys, Associate Judge)

(Argued June 16, 2021                    Decided August 19, 2021)

*Allison K. Bauer* was on the brief for appellant.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, *Stacy L. Anderson*, Senior Assistant Attorney General, and *David Stark*, Assistant Attorney General, were on the brief for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and OKUN, *Associate Judge*, Superior Court of the District of Columbia.[*]

EASTERLY, *Associate Judge*: A determination that a parent is unable to

discharge their responsibilities to care for their child due to mental incapacity under

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

D.C. Code § 16-2301(9)(A)(iii) (2012 Repl. & 2021 Supp.) is momentous. It can have an adverse impact on the parent, both legally and reputationally. For this reason, even if a parent opts not to challenge other grounds of neglect under D.C. Code § 16-2301(9)(A), a parent will often still be able to demonstrate that they have standing to seek review of a mental incapacity determination. Further, a mental incapacity neglect determination must be supported by sufficient evidence, which may well necessitate a presentation of expert testimony. This case illustrates these principles.

## I. Facts and Procedural History

In 2018, the District's Child and Family Services Agency opened an investigation into then eight-year-old B.C.'s care by his mother, C.P. CFSA subsequently filed neglect charges pursuant to D.C. Code § 16-2301(9)(A)(ii) (defining a neglected child to include one "who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent"), and D.C. Code § 16-2301(9)(A)(iii) (defining a neglected child to include one "whose parent . . . is unable to discharge

his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity").

## A. The Government's Theories of Neglect and the Evidence at Trial

At the 2019 neglect trial before a magistrate judge, the government argued that B.C. was a neglected child under D.C. Code § 16-2301(9)(A)(ii) because "his basic educational needs [were] not being met." The government presented evidence that B.C. had been enrolled and removed from three different schools in the fall of 2018, that he had attended school at most a handful of days during that timeframe, that C.P. had eventually sought authorization/permission to homeschool him but had not received the waiver she needed as a non-high school graduate, and that B.C.'s current academic performance was far below grade level.

Separately, the government argued that B.C. was a neglected child under D.C. Code § 16-2301(9)(A)(iii) because C.P.'s mental incapacity rendered her unable to discharge her parental responsibilities. The government's theory was that C.P. had previously exhibited paranoid behavior and delusional thinking, she had sought unnecessary medical treatment for herself, and she was now doing the same for B.C. To this last point, the government submitted medical records for B.C., documenting C.P.'s numerous efforts to get B.C. care, often in relation to swelling on the right

side of his face. These records showed, however, that medical professionals had observed the swelling, diagnosed an abscessed tooth, and recommended soft tissue excision as treatment.

The government did not present any recent psychiatric records or expert testimony to substantiate its allegation that C.P.'s mental incapacity led her to seek unnecessary treatment for B.C. Instead, the government presented a variety of medical records from (1) Jordan House, a psychiatric facility where C.P. received treatment for three days in 2011 for depression and suicidal ideation before checking herself out against therapeutic advice; (2) Core Health and Wellness Center, a "primary care, alternative medicine and holistic wellness services" facility,[2] documenting numerous appointments for a range of reported ailments in 2012–16 which indicated that she may have had ongoing mental health issues,[3] but only a handful of appointments in 2017 and 2018 for ailments which were verified and treated; and (3) United Medical Center, spanning 2011–19, documenting

---

[2] *About us*, Core Health and Wellness Center, https://www.corehealthdc.com/about-us; https://perma.cc/KZZ3-VHVJ (last visited August 10, 2021).

[3] A 2014 note stated that C.P. had requested a heart transplant. A 2016 note stated that she had claimed to have untreated cancer. And a 2016 note stated that she "sees psychiatry but has remarked to the other providers [at Core Health and Wellness Center] that she does not take her psychiatric medicines."

appointments in 2017–19 for verified and treated ailments and minor injuries (e.g., a recurring sore throat, a urinary tract infection, and a bruised finger).

The government also presented testimony regarding C.P.'s mental health from three CFSA employees who had interacted with C.P.[4] Narendra Date, the social worker assigned to B.C.'s case in 2018, testified that he met with C.P. in person five times over the course of that year and that C.P. was generally resistant to his effort to investigate her case and would not let him talk to B.C. alone. Mr. Date stated that "there was an indication that [C.P.] had unaddressed mental health needs." When asked to elaborate on the behavior that led him to believe C.P. had unaddressed mental health needs, he stated that she "mistrust[ed] the people around here" and had "ideations about herself being seriously ill . . . [and] about the child being seriously ill without any documentations to back it up."

---

[4] Other government witnesses testified that they had contact with C.P., but they provided no information related to C.P.'s mental health or capacity: (1) Stephanie Thomas, the homeschool coordinator for the Office of the State Superintendent of Education, testified about her communications with C.P. in the fall of 2018 regarding approval of homeschooling for B.C., and (2) Nikki Barnes, B.C.'s teacher, testified that she had had a phone call and an email exchange with C.P., but she was not asked to detail those conversations.

Edward Rodrigues, the social worker assigned to B.C.'s case in January 2019 after B.C. was removed from C.P.'s care, testified that he had talked on the phone and texted with C.P. weekly but met with her only once to supervise a visit with B.C. He noted that her texts could sometimes "go[] onto a tangent" and that she had called the police on him twice.[5] He expressed concern about her "lack of awareness of her mental health needs" but also stated that "I don't know if it's — we have an understanding of where she is at mentally right now." When asked to explain why he thought she had current mental health needs, he testified that it was "[j]ust the long text messages that are . . . kind of incoherent; the ongoing lack of trust with anyone, particularly me," and "[t]he idea that she still sees . . . a medical problem, or dental problems despite the advice of the doctor." But he also testified that their relationship had improved over time, that she had become "more open" to working with the agency, and that she was working with a peer mentor. When asked to connect his concerns about C.P.'s mental health to her parenting, he testified that "I can't say because I've only witnessed one visit."

Lastly, Shanay Tymus, a registered nurse employed by CFSA, testified about accompanying Mr. Date on a home visit to C.P.'s house in April 2018. At that visit,

---

[5] He provided no detail about these incidents.

she and Mr. Date tried to get more information about B.C.'s health history, but C.P. refused to provide them any documents or sign a release form. Ms. Tymus testified that C.P. was "frustrated, really defensive, kind of like paranoid, but she wasn't confrontational or anything."

C.P. testified on her own behalf. Regarding B.C.'s education, she explained that, with authorization and instructions from OSSE, she had homeschooled him in 2017 (when B.C. would have been in first grade) because "he improves with working one-on-one." She testified that she used "many" curriculums from the D.C. Library, but she was not asked to identify any one of them by name. She testified that, for reading, she used flash cards to teach B.C. sight words; for math, she worked with him on addition and subtraction (she noted that he struggled with double digit numbers); for science, she had him draw pictures of "plants, and things like that." Over the summer of 2018, she enrolled him in Beers Elementary School, but she explained that he never attended because it was 30 minutes away and she wanted to enroll him at a school closer to home. She then enrolled B.C. at Martin Luther King, Jr. Elementary School, but when he got a spot at Ingenuity Prep, she decided to enroll him there because she wanted him to "go to a prep school [instead of a] public school." She took him out of Ingenuity Prep after a few weeks because of bullying concerns, but she explained that she got in contact with OSSE to get permission to

homeschool B.C. again. She acknowledged that her "pattern" of enrolling and removing B.C. from various schools did not reflect "the best choices." She testified that she was learning from her mistakes. She vaguely testified that in the fall of 2018 she taught B.C. in "all" subjects, and she documented her instruction, albeit incompletely, in the required portfolio. She acknowledged that B.C. was behind academically and that his Individualized Education Plan from kindergarten had expired, but she testified that she had been trying to update it with Ingenuity Prep.

Regarding her mental health, C.P. admitted that she had received treatment in 2011–12 for postpartum depression but stated that she had no current diagnoses. Regarding B.C.'s medical care, she testified that his facial swelling was documented and diagnosed as the reaction to an impacted molar, and she pushed back against the notion that "[she] was just paranoid." She explained that B.C. was scheduled to have a surgical procedure to address his impacted molar in January, but he was removed from her care before the procedure could be performed.

## B. The Neglect Determinations by the Magistrate Judge and the Associate Judge

After the government gave its initial closing argument, the magistrate judge indicated for the first time that she was contemplating whether B.C. was neglected

not only based on the government's theories that (1) C.P. had failed to ensure B.C. was getting adequate educational support, and (2) C.P.'s mental incapacity had caused her to seek out unnecessary medical care for B.C., but also based on a theory that the government had not argued, namely, (3) C.P.'s alleged mental incapacity had affected her decisionmaking regarding B.C.'s education.[6]

Alluding to the need to prove that a parent's mental incapacity has a nexus to a child's neglect, the magistrate judge asked the government during its rebuttal, "what's the nexus for *both the school* and the medical?" The government responded only "as it relates to the medical" by explaining that "there's a nexus between her mental health, her paranoia and her fixation that something is wrong with B.[C.]" The magistrate judge subsequently asked again, "what do you say the nexus is on the mental health on the decision making around schooling?" Obliged to address the court's question, the government focused on the fact that B.C. was not getting the educational support he needed but proffered no link to C.P.'s mental health. Indeed, highlighting C.P.'s movement of B.C. from school to school, the counsel for the government acknowledged that he was "not sure of" "[t]he reason" for her

---

[6] The magistrate judge appeared to have adopted this theory from the guardian ad litem, who argued in opening and closing that C.P.'s mental incapacity adversely impacted her decisionmaking regarding B.C.'s medical care and his education.

actions. Even so, the government ended the discussion by conclusorily arguing that B.C. was "unable to get what he needs educationally in [C.P.'s] care because [of] the mental health and the medical issue."

In a written order, the magistrate judge determined that the government had carried its burden to prove educational neglect, D.C. Code § 16-2301(9)(A)(ii), but not neglect by reason of mental incapacity under D.C. Code § 16-2301(9)(A)(iii) insofar as that neglect related to C.P.'s efforts to seek out unnecessary medical care for B.C. As to the latter theory of neglect, the magistrate judge found that "the mother has some level of paranoia but the record does not establish that the paranoia rises to the level of being the cause of the number o[f] appointments/providers consulted" regarding the swelling on the side of B.C.'s face. The magistrate judge highlighted the lack of "live testimony" regarding B.C.'s medical care, specifically the failure of the government to "call the providers as witnesses or to present the entirety of [B.C.'s] medical records to a medical expert . . . and have that expert testify." While acknowledging that the number of appointments made by C.P. to address this issue seemed "excessive," the magistrate judge observed that "the medical records are replete with conclusions drawn by the medical/dental professional about the mother's understanding, motivation, actions, etc. that cannot be properly cross[-]examined" and it was "essential under the circumstances to have

at least one expert to be able to opine on the mother's actions being tantamount to medical neglect."

Nevertheless, the magistrate judge concluded that B.C. was neglected under D.C. Code § 16-2301(9)(A)(iii) based on the third theory of neglect that she had raised, namely the theory that B.C. was neglected because of C.P.'s mental incapacity as reflected in her poor educational decisionmaking. Reviewing the evidence of C.P.'s mental incapacity, the magistrate judge no longer expressed any concern about the absence of expert testimony. Appearing to rely on the medical records as well as the testimony of lay witnesses, the magistrate judge found that C.P. "has a diagnosis of post-partum depression and struggles with other mental health issues related to anxiety, paranoia, and an inability to trust others." The magistrate judge also found that C.P.'s mental health issues had a nexus to her educational decisions for B.C. The magistrate judge connected C.P.'s "lack of trust in others and inability to have [B.C.] outside her sight" both to the fact that, "when he attended school, [he] would regularly arrive late or was picked up early," and to C.P.'s decision to homeschool B.C. The magistrate judge also noted that C.P. "admitted to making poor decisions as it relates to" B.C.'s education. Finally, the court noted C.P.'s "lack of insight" regarding B.C.'s "multiple school placements"

and whether and how to homeschool him in light of his needs and her lack of a high school diploma.

C.P. sought review by an associate judge and raised sufficiency challenges to both of the magistrate judge's neglect determinations. The associate judge determined that the educational neglect determination under D.C. Code § 16-2301(9)(A)(ii) was amply supported by B.C.'s extended school absences and C.P.'s inadequate homeschooling. The associate judge likewise determined that the mental incapacity neglect determination under D.C. Code § 16-2301(9)(A)(iii) was supported by sufficient evidence. The associate judge rejected C.P.'s argument that expert testimony addressing her mental health should have been presented, citing decisions of this court for the proposition that mental incapacity under the neglect statute "need not be a diagnosable mental illness" and need not be established by expert testimony. The associate judge concluded that recognizing and understanding C.P.'s "obsession with imaginary medical conditions which [B.C.] and she do not have, paranoia, anxiety, and a severe lack of trust" were "within the realm of common knowledge." The associate judge further concluded that there was sufficient evidence that C.P.'s mental incapacity led to B.C.'s deficient education. The associate judge attributed B.C.'s absence from school to his numerous medical appointments; opined that C.P.'s "demonstrated paranoia" and "lack-of-trust in

leaving [B.C.] in the care of third parties . . . were the reasons that [C.P.] opted to home-school [B.C.]"; and determined that C.P.'s "mental incapacity (which precluded her from recognizing her own inadequacies as a home schooling teacher) interfered with her ability to adequately provide homeschooling instruction to [B.C.]" This appeal followed.

## II. Analysis

### A. Standing

Before we consider the merits of C.P.'s sufficiency challenge, we must address the government's challenge to her standing to pursue this appeal. *See D.C. Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec., & Banking*, 54 A.3d 1188, 1199 (D.C. 2012) ("Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." (internal quotation marks omitted)). In her brief to this court, C.P. does not challenge the educational neglect determination pursuant to D.C. Code § 16-2301(9)(A)(ii); she only challenges the mental incapacity neglect determination pursuant to D.C. Code § 16-2301(9)(A)(iii). Because B.C. will still be adjudicated neglected regardless of the outcome of this appeal, the government argues that C.P. lacks standing to be heard by this court regarding any errors in the associate judge's

order affirming the magistrate judge's findings of fact and conclusions of law that she neglected B.C. We cannot agree.

Generally, to establish standing, a litigant must have "a personal stake in the outcome of the controversy." *Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015) (internal quotation marks omitted). The litigant must claim "an actual or imminent, concrete and particularized, invasion of a legally protected interest" that can be "'fairly trace[d]' to [the opposing party's] challenged actions" and that can "be redressed by a favorable decision." *Id.* (ellipsis omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 42 (D.C. 2015) (explaining that this court, although created under Article I, "generally adhere[s] to the case and controversy requirement of Article III" of the Constitution). We have no trouble concluding that C.P. has the requisite personal stake in the outcome of this appeal.

Beyond the injury of having a child removed from their care, a parent whose child has been deemed neglected is adversely impacted by the neglect determination itself, which "constitutes a permanent, and significant, stigma." *In re E.R.*, 649 A.2d 10, 12 (D.C. 1994) (internal quotation marks omitted). The impact on a parent's reputational interest alone gives them standing to challenge a determination of

neglect. *Cf. id.* at 13 (holding that the mother's appeal of a neglect determination was not moot even though her child had left the country and did not intend to return); *In re G.H.*, 797 A.2d 679, 683 (D.C. 2002) (in a neglect appeal, holding that the mother's boyfriend had "a reputational interest sufficient to provide him with standing to challenge" the determination that he had physically abused a child, even though he was "in no position to complain of the disposition of the children in the absence of an appeal by the mother").

The government argues that it is "purely speculative" for C.P. to argue that she will suffer reputational harm from the neglect determination under § 16-2301(9)(A)(iii) that is separate and distinct from the harm of a neglect determination under § 16-2301(9)(A)(ii). But the determination that a parent is so mentally incapacitated—i.e., that they have some sort of mental health condition or cognitive impairment, *see infra* II.B.1. (discussing the definition of this term)—that the incapacity has caused the child to be neglected impinges on a parent's reputation in a way that is distinct from a determination that a parent has failed to meet the government's educational standards for their child. *See* Bruce J. Winick, *The Side Effects of Incompetency Labeling and the Implications for Mental Health Law*, 1 PSYCHOL. PUB. POL'Y & L. 6, 8 (1995) (explaining that the adverse effects of a mental incompetence label applied by courts and administrative bodies include not

only legal consequences but also "serious social disadvantages, adversely affecting the way others regard and treat" those who are so labeled); Justin L. Joffe, Student Note, *Don't Call Me Crazy: A Survey of America's Mental Health System*, 91 CHI.-KENT L. REV. 1145, 1166–68 (2016) (explaining that "the stigma surrounding mental illness stubbornly persists," notwithstanding advances in understanding of the causes and treatments of mental illness). The distinct impact of a mental incapacity neglect determination is sufficient to give C.P. standing to challenge this determination on appeal. *Cf. In re A.B.*, 999 A.2d 36, 44 n.25 (D.C. 2010) (rejecting the argument that, because it was affirming neglect as to one child, "any additional injury to [the mother's] reputation flowing from the neglect findings with respect to her other children is too negligible to support her standing to contest them").

*In re Z.C.*, 813 A.2d 199 (D.C. 2002), cited by the government, is factually inapposite and does not support a different conclusion. In that case, the mother, who had repeatedly and severely beaten her son, was convicted of assaulting him with a dangerous weapon and sentenced to a term of imprisonment. She was then deemed to have neglected him on multiple grounds, including that she was unable to discharge her responsibilities as a parent "because of incarceration." *Id.* at 200 n.3 (quoting D.C. Code § 16-2301(9)(C) (2001)). The mother sought review of only that incarceration neglect determination, and this court determined that she lacked

standing to appeal. *Id.* at 202. Distinguishing cases like *In re E.R.* and *In re G.H.*, where we had concluded the appellants had standing based on the adverse impact a neglect determination had on their reputational interests, we concluded in *In re Z.C.* that "[t]he mother's [ADW] conviction . . . is a permanent stigma that would survive any relief that she could obtain through this appeal." 813 A.2d at 203. Unlike in *In re Z.C.*, in this case there is no other independent adjudication of the basis for the challenged neglect (C.P.'s alleged mental incapacity) that would negate the possibility of additional, appreciable reputational harm and preclude any meaningful relief if that neglect determination were reversed.

In any event, the harm from the mental incapacity neglect determination that C.P. seeks to challenge is not just reputational and not at all speculative. Once a child has been deemed neglected and removed from the parent's custody, the court must regularly conduct permanency planning hearings to determine inter alia "whether, and if so when, the child will be returned to the parent(s)." *In re Ta.L.*, 149 A.3d 1060, 1077 (D.C. 2016) (en banc) (citing D.C. Code § 16-2323(c)(2) (2012 Repl.). A "primary focus" of a permanency planning hearing is "on the parents' efforts to ameliorate the *conditions that led to the neglect* and the District's efforts to assist them in achieving those goals." *Id.* at 1078 (emphasis added). Accordingly, a particular determination of neglect, such as a mental incapacity neglect

determination under § 16-2301(9)(A)(iii), is likely to have a direct impact on the parent's ability to regain custody of their children. *Cf. In re A.B.*, 999 A.2d at 44 n.25 (concluding that the mother's challenge to neglect determinations was not moot even though the children had been returned to her because the neglect determinations "might indirectly affect [her] status in potential future proceedings" (internal quotation marks omitted)).

The government dismisses these collateral legal consequences, however. It asserts that "there is no reason to think that permanency planning for B.C. will be adversely impacted by" the § 16-2301(9)(A)(iii) neglect determination "because the Superior Court Family Division does not need an adjudication [thereunder] in order to remediate neglect under [§ 16-2301(9)(A)(ii)] where the court *believes* the neglect under (ii) is predicated on concerns of a parent's mental health." To the extent the government is arguing that trial courts may act on "belief" instead of substantiated facts, we disagree. Absent a determination that a parent's mental incapacity led to their child's neglect, the government would have to present some evidence at a permanency planning hearing that mental health or incapacity was impeding reunification in order to convince the court to order remedial measures. *See In re Z.W.*, 214 A.3d 1023, 1036–37 (D.C. 2019) (trial court's permanency goal decisions "must be based upon and drawn from a firm factual foundation" (internal quotation

marks omitted)). In contrast, if a mental incapacity neglect determination pursuant to § 16-2301(9)(A)(iii) has been made, the court would necessarily incorporate an assessment of the parent's mental health or incapacity into its permanency planning calculus. *See* § 16-2323(b)(4). Accordingly, the existence of the mental incapacity determination is a cognizable harm to C.P.

The government separately argues that even if C.P. can show the requisite injury for standing, there is another reason to conclude that C.P. cannot pursue this appeal, namely that "this [c]ourt reviews judgments and not merely findings." As support for this proposition, the government once again relies on this court's decision in *In re Z.C.* We acknowledge that, after concluding that the mother in that case did not have standing to pursue an appeal, this court went on to observe in its final paragraph that the appeal was "subject to dismissal for a slightly different, but related, reason." *In re Z.C.*, 813 A.2d at 203. We explained that "the case [was] reminiscent of *Thoubboron v. Ford Motor Co.*, 624 A.2d 1210 (D.C. 1993)," where we had observed that "this court reviews judgments, not opinions" and declined the appellant's request to "strike . . . dictum" from a trial court's order. *In re Z.C.*, 813 A.2d at 203 (brackets and internal quotation marks omitted). We then said in *In re Z.C.* that "*this case* does not differ in principle from the issue addressed in the *Thoubboron* footnote." 813 A.2d at 203 (emphasis added).

For multiple reasons, we disagree that *In re Z.C.* categorically bars appellate review of fewer than all neglect determinations made in a case. First, if this court in *In re Z.C.* had meant to impose such a categorical bar, the preceding standing analysis that serves as the foundation for the court's primary holding would have been entirely unnecessary. *See* 813 A.2d at 203 (discussing the lack of reputational harm and concluding that "[a]ccordingly, the mother lacks standing to prosecute her appeal"); *see also In re M.L.*, 28 A.3d 520, 531 n.22 (D.C. 2011) (relying on *In re Z.C.* for the principle that an appellant who cannot secure "any remedial benefit from a decision by this court" lacks standing to bring an appeal (internal quotation marks omitted)). Second and relatedly, any such categorical bar would have been irreconcilable with the binding precedent cited in *In re Z.C.*, authorizing neglect appeals to be litigated even though they would not alter the bottom-line adjudication of neglect. *See In re G.H.*, 797 A.2d at 683, 686 (allowing mother's boyfriend to pursue his appeal, even though it could not affect the neglect adjudication, and ultimately concluding that the evidence was insufficient to support the finding that the boyfriend had placed two of the children in danger, but leaving the disposition order undisturbed). Third, it is simply incorrect that this court only reviews "judgments." We regularly review component rulings within judgments, and when we conclude that any errors were harmless, we do not simply dismiss these appeals. Fourth and finally, it would make little sense to force appellants to frivolously

challenge every neglect determination just to be able to claim standing to challenge one that can cause real injury under a traditional standing analysis. In the absence of any subsequent decision relying on this language in the manner the government advocates, we thus interpret *In re Z.C.* narrowly as a decision where our discussion of appealability was driven by our assessment that the mother—who was not challenging the determination either that she was in prison or that she was unable to personally care for her children as a result—was, like the litigant in *Thoubboron*, seeking review of inconsequential facts. *See In re Z.C.*, 813 A.2d at 200 n.4.

For all of these reasons, we hold that C.P. has standing to challenge on appeal the determination of neglect pursuant to D.C. § 16-2301(9)(A)(iii).

## B. Sufficiency of the Evidence

"In a child neglect proceeding, the [government] has the burden of proving by a preponderance of the evidence that a child is neglected . . . ." *In re E.H.*, 718 A.2d 162, 168 (D.C. 1998). On appeal, "[w]e will reverse a finding of neglect only if it is plainly wrong or without evidence to support it, and only after viewing the evidence in the light most favorable to the court's ruling." *In re Ta.C.*, 237 A.3d 114, 120 (D.C. 2020) (internal quotation marks omitted). "But consistent with that deference, we must ensure that a finding of neglect embodies a correct understanding

of the relevant statutory terms. The proper construction of the neglect statute is a legal question, as to which our review is not deferential, but de novo." *Id*. (brackets, footnote, and internal quotation marks omitted). In addition, as we explained in *In re S.L.G.*, 110 A.3d 1275 (D.C. 2015), although our review is of "the order of the associate judge, who reviewed the magistrate judge's order in this case for errors of law, abuse of discretion, or clear lack of evidentiary support," we may still "look to the findings and conclusions of the fact finder on which that ruling is based." *Id*. at 1285 (internal quotation marks omitted).

In order to make out a case of neglect under D.C. Code § 16-2301(9)(A)(iii), the government must prove both that a parent has a mental incapacity and that the mental incapacity has caused their "inability to provide proper parental care," i.e., that there is a nexus between the mental incapacity and their lack of care for the child. *In re P.B.*, 54 A.3d 660, 667 (D.C. 2012) (quoting *In re N.P.*, 882 A.2d 241, 251 (D.C. 2005)). Here, C.P. argues that the government failed to carry its burden for either element. We examine each in turn.

## *1.* *Mental incapacity*

While acknowledging that "she has a history of mental health issues and hospitalization in 2010 through 2012" after B.C.'s birth, C.P. argues that the evidence was insufficient for the Superior Court to find that she suffered from a mental incapacity at the time of the alleged neglect in 2018–19, particularly in the absence of any expert testimony. In essence, she argues that the mental health records from six to eight years earlier presented by the government had little bearing on her mental state in 2018–19 and that the "observations made by Mr. Date, Ms. Tymus, and Mr. Rodrigues," none of whom are licensed mental health professionals, were too limited to support a determination that she was mentally incapacitated at the time of the alleged neglect.

Before we assess the sufficiency of the evidence of mental incapacity presented at the neglect trial in this case, we must address two predicate subjects, namely, the meaning of "mental incapacity" and the manner in which it may be proved. The term "mental incapacity" is not defined in the neglect statute, and the closest this court has come to discerning the definition of the term is to reject efforts to interpret it too narrowly. *See, e.g. In re N.P.*, 882 A.2d at 251 (concluding that the government's expert testimony diagnosing the mother with battered woman

syndrome, "severe dependency," and low-level intellectual functioning was sufficient evidence of "mental incapacity"); *In re P.B.*, 54 A.3d at 664–65, 667 (concluding that the government's evidence of the mother's mental incapacity was sufficient where (1) the government's expert testified that the mother suffered from some sort of mood disorder, (2) the mother's expert agreed that testimony about the mother's behavior, if credited, indicated she "might be suffering from some kind of psychotic condition," and (3) "numerous witnesses . . . described [the mother's] paranoid beliefs, delusional thinking, and seclusion" (internal quotation marks omitted)). Thus, we have yet to discern a comprehensive definition for this statutory term.

"We start, as we must, with the language of the statute." *Tippett v. Daly*, 10 A.3d 1123, 1126 (D.C. 2010) (internal quotation marks omitted). In examining this language, "it is axiomatic that the words . . . should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Id.* (internal quotation marks omitted); *see also id.* at 1127 (endorsing "look[ing] to dictionary definitions to determine the ordinary meaning"). The ordinary meaning of "mental" is "of or relating to the mind," *Mental*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); and the ordinary meaning of "incapacity" is the "quality or state of being incapable," *Incapacity*, *Merriam-Webster's Collegiate Dictionary*, with

"incapable" meaning "lacking capacity, ability, or qualification for the purpose or end in view," *Incapable*, *Merriam-Webster's Collegiate Dictionary*. Reading these words together makes readily apparent that "mental incapacity" encompasses, but is not limited to, debilitating mental illness. *See In re N.P.*, 882 A.2d at 251 (incorporating an assessment of mother's cognitive ability). The cause of mental incapacity encompasses a range of psychiatric, psychological, or physiological conditions that may adversely impact a parent's thought processes. But those conditions must be related to mental functioning, and they must be "incapacitating," i.e., they must pose a serious impediment to the parent's ability to navigate their daily life. This conclusion is compelled not just because of the statutory language, but also because of the underlying constitutional considerations which limit the government's power to intrude into the parent-child relationship.[7] The exercise of poor judgment or irrational decisionmaking cannot be enough. Parents are human after all; they can and do make mistakes.

---

[7] *See In re Ta.L.*, 149 A.3d at 1072 (acknowledging "the fundamental right of parents to raise their children"); see also *id.* at 1121–27 (Beckwith & Easterly, JJ., concurring in part and dissenting in part) (same).

Relatedly, because mental incapacity often is "related to some science, profession, or occupation [so] as to be beyond the ken of the average layperson,"[8] it may well need to be substantiated with expert testimony, as the neglect statute and our cases reflect. Like other provisions of the D.C. Code,[9] the neglect statute anticipates the need for expert input and authorizes the court "on its own motion or the motion of any party, for good cause shown," to "order the mental . . . examination of the parent, guardian, or custodian of the child whose ability to care for the child is at issue."[10] D.C. Code § 16-2315(e)(1) (2012 Repl.). Likewise, our

---

[8] *In re B.L.*, 824 A.2d 954, 956 (D.C. 2003) (internal quotation marks omitted); *cf. In re Wyler*, 46 A.3d 396, 401 (D.C. 2012) (recognizing that mental illness is an "unusually complex and technical area" and explaining that proffered expert testimony must be properly vetted).

Mental health professionals in the District are required to be professionally licensed (e.g., license to practice medicine, license to practice psychology, license to serve as a social worker). *See* D.C. Code § 7-1201.01(11) (2018 Repl.). More specifically, for a social worker to opine on a diagnosis and treatment of psychosocial problems, the social worker has to have "at least 3,000 hours of post-master's or postdoctoral experience participating in the diagnosis and treatment of individuals . . . with psychosocial problems." D.C. Code § 3-1208.04(a) (2021 Repl.).

[9] *See, e.g.*, D.C. Code § 21-2204(a) (2012 Repl.) (providing that before health care decisions for a person with mental illness may be made by a third party, the individual's mental incapacity must be certified "by 2 professionals who are licensed to practice in the District and qualified to make a determination of mental incapacity").

[10] The magistrate judge twice directed C.P. to get a mental health assessment. The government represents in its brief that C.P. did not "timely present herself" for evaluation. But there is no information in the record about C.P.'s compliance with these orders. In any event, C.P.'s compliance was not essential to the presentation

cases reflect regular reliance on the testimony of one or more experts to support a determination of mental capacity.[11] *See, e.g.*, *In re E.H.*, 718 A.2d at 166–68 (five medical experts testified); *In re P.B.*, 54 A.3d at 664–65 (two medical experts testified); *In re K.M.*, 75 A.3d 224, 233–35 (D.C. 2013) (two medical experts testified, but evidence of nexus to neglect deemed insufficient).

Turning to the evidence in this case, we consider the foundation for the associate judge's conclusion that the government had carried its burden to prove C.P.'s "mental incapacity, specifically obsession with imaginary medical conditions which [B.C.] and she do not have, paranoia, anxiety, and a severe lack of trust."[12]

---

of expert testimony, which could have been based on C.P.'s medical records. *Cf. In re Amey*, 40 A.3d 902, 914–15 (D.C. 2012) (holding trial court did not err by allowing psychiatrist testifying as an expert witness to refer to hospital records and other hearsay statements in explaining the basis of his opinions, in part because hospital records "are unquestionably of the type[] [of statement] customarily relied on by psychiatrists" ).

[11] The government highlights our determination in *In re B.L.* that alcoholism, the subject of the mental incapacity, was "a matter of common knowledge" which did not need to be substantiated with expert testimony. 824 A.2d at 956 (internal quotation marks omitted)). For the reasons discussed above, we disagree with the government that *In re B.L.* supports an expansive proposition that expert testimony is generally unnecessary to prove a parent's mental incapacity under D.C. Code § 16-2301(9)(A)(iii); the case simply held that expert testimony was not required in light of the facts of that case.

[12] Unlike the magistrate judge, the associate judge does not appear to have relied on C.P.'s historical "diagnosis of post-partum depression." We agree that this diagnosis did not assist the government in carrying its burden of proof. We see no

To support her determination of C.P.'s mental incapacity, the associate judge relied on nine years of C.P.'s medical records that the government put into evidence. The associate judge noted that these records documented C.P.'s "several mental health hospitalizations, including an involuntary commitment" and her receipt of "Haldol, a psychotropic medication, on multiple occasions" and reflected her "history of paranoia, depression, and anxiety." The associate judge also relied on "[r]ecords from [C.P.'s] primary care physician, Core Health and Wellness, indicat[ing] that [C.P.] would frequently request unnecessary medical procedures [and] exaggerate her symptoms."

While this court has held that "[i]n evaluating the child's condition, the trial court's inquiry must go beyond simply examining the most recent episode [of neglect] or a single snapshot [in time], and instead must consider the entire mosaic in making its determination," *In re P.B.*, 54 A.3d at 666 (brackets, citation, and internal quotation marks omitted), particularly when assessing a parent's mental incapacity,

_____

connection on this record between C.P.'s diagnosis of postpartum depression after B.C.'s birth and her mental state years later, particularly in the absence of any expert testimony explaining what postpartum depression is, how long it can last, and whether and how it relates to other mental health issues. Although we held in *In re B.L.* that expert testimony is not necessarily required to support a finding of mental incapacity under the statute if the source of the incapacity is "a matter of common knowledge," 824 A.2d at 956, as our questions reveal, we cannot so categorize postpartum depression.

the trial court must also take care not to rely too heavily on dated and potentially stale information. Here, we cannot agree that C.P.'s medical records carry much weight in establishing C.P.'s mental incapacity at the time of the alleged neglect. C.P.'s actual mental health records were, like her postpartum depression diagnosis, *see supra* note 12, many years old, from 2010–12. *See In re L.H.*, 925 A.2d 579, 582–83 (D.C. 2007) (concluding that there was no foundation for the "perceived . . . link" between mother's hospitalization and mental health treatment in 1998 and the state of her mental health at the time of the alleged neglect in 2004–05). Although C.P.'s overall medical records spanned a time period up to the time of the alleged neglect, the records that reflected a potential mental health problem—those documenting her efforts to obtain medical care for perhaps questionable complaints—were not contemporaneous with the alleged neglect. Rather, the medical records from 2018–19 reflected that she had properly sought and received treatment for verified ailments. Particularly in the absence of expert testimony explaining what could be gleaned from these records about C.P.'s current mental health, the associate judge's inference from these records that C.P. was currently mentally incapacitated "rests, in our view, on too much speculation." *Id.* at 582–83 ("[T]he judge heard no psychiatric or other medical testimony relating the mother's past medical condition to her conduct in 2004 and her present capacity to parent.").

As additional and more current evidence of C.P.'s mental incapacity, the associate judge also relied on the medical records reflecting C.P.'s multiple efforts to obtain medical care primarily for B.C.'s facial swelling. But the magistrate judge had deemed these same records insufficient to support a determination that C.P.'s mental incapacity caused her to seek out unnecessary medical treatment for B.C. We agree with the magistrate judge that, on their own, these records did not support a determination that visiting medical professionals was "a symptom of [C.P.'s] paranoia," as opposed to "a well-reasoned decision" and "proper diligence" on C.P.'s part, especially when the evidence established that B.C. in fact had visible facial swelling. And we further agree that it was "essential . . . to have at least one expert to be able to opine on the mother's actions being tantamount to medical neglect." Accordingly, while "mindful . . . of a trial judge's prerogative to draw reasonable inferences from the record," *In re L.H.*, 925 A.2d at 582, we cannot endorse the associate judge's reliance on the same medical records to support a determination that C.P. was mentally incapacitated in the context of her educational decisionmaking for B.C.[13] Here too, expert testimony was needed to evaluate the medical records and explain their relevance to C.P.'s current mental health.

---

[13] The associate judge's reliance on these records after the magistrate judge declined to rely on them might be attributable to the associate judge's misunderstanding that C.P. had imagined B.C.'s facial swelling.

This leaves the testimony from three lay witnesses—two CFSA social workers assigned to C.P.'s case, Mr. Date and Mr. Rodrigues, and one CFSA registered nurse, Ms. Tymus—who testified for the government about their observations of C.P. The associate judge, like the magistrate judge before her, relied on this testimony to support her determination that C.P. was mentally incapacitated. Examining this testimony, we conclude that, at most, it constituted some evidence on which an expert diagnosis could have been based or corroborated. But these witnesses were not themselves qualified to make such a diagnosis, *see supra* note 8, and their ultimately equivocal testimony did not provide a foundation for the associate judge to determine that C.P.'s mental state could be assessed based on common knowledge.

All three witnesses testified about C.P.'s resistance to working with them, and Mr. Date and Mr. Rodrigues both cited C.P.'s distrust of them as a basis of their belief that C.P. might have mental health issues. Although these CFSA employees considered C.P.'s hostility abnormal, some amount of distrust and resentment is not surprising under the circumstances where parents know that CFSA is responsible for the removal of their child from their custody. Furthermore, Mr. Rodrigues, who had had the most recent contact with C.P., testified that the situation had improved in the four months he had been working on B.C.'s case. Mr. Date and Mr. Rodrigues also

grounded their mental health concerns in C.P.'s efforts to seek medical treatment for B.C. But as discussed above, this was the allegation the magistrate judge determined could not be supported in the absence of expert testimony. Ultimately, none of these witnesses testified with any certainty that C.P. actually had a mental illness. Mr. Date, who worked on B.C.'s case for the longest time and had the most in-person interactions with C.P., testified only that "there was an *indication* that she had unaddressed mental health needs." (emphasis added). Mr. Rodrigues testified only that he was "concern[ed]" about C.P.'s "lack of awareness of her mental health needs" but also acknowledged that he was unsure that the agency had "an understanding of where she is at mentally right now."

This layperson testimony, like the mental health and medical records presented by the government, was not sufficient to prove C.P.'s mental incapacity at the time of the alleged neglect. Instead, this evidence in its totality indicates that the situation was complicated and ambiguous, particularly in the absence of expert testimony. The associate judge's own assessment that C.P. was "obsess[ed] with imaginary medical conditions" and suffered from "paranoia, anxiety, and a severe lack of trust" was thus not adequately founded, and her conclusion that the government had carried its burden to establish mental incapacity to support a determination of neglect pursuant to § 16-2301(9)(A)(iii) was in error.

## 2. *Nexus to Educational Neglect*

As noted above, in addition to proving a parent's mental incapacity at the time of the alleged neglect, the government must demonstrate a causal relationship between a parent's mental incapacity and their inability provide parental care. *See In re E.H.*, 718 A.2d at 169. "Without any evidence of such a nexus, the adjudication of neglect under [subsection (9)(A)(iii)] cannot be sustained." *In re Am. V.*, 833 A.2d 493, 499 (D.C. 2003) (insufficient evidence of nexus between mother's incapacity and inadequate care for her child); *see also In re K.M.*, 75 A.3d at 231–33; *In re N.P.*, 882 A.2d at 251. Assuming for the sake of argument that C.P. was mentally incapacitated at the time of the alleged neglect, there is simply no proof in this record that her mental health had any bearing on B.C.'s educational neglect. None of the government's witnesses provided any such nexus testimony because this was not the theory of neglect that the government pursued at trial. *See supra* I.A. The government's theory was that C.P.'s mental incapacity had led her to seek unnecessary *medical* care for B.C. It was only after the magistrate judge twice prompted the government to argue this alternate rationale that C.P.'s mental incapacity led to B.C.'s educational neglect that the government pivoted to this theory of neglect under § 16-2301(9)(A)(iii).

To the extent any relevant evidence was presented, it did not support a nexus between any mental incapacity and B.C.'s educational neglect; instead it indicated that C.P. was attentive to and concerned about B.C.'s education, even as she failed to make good choices for him. Although she enrolled B.C. at three different schools in a short span of time, C.P. offered not patently unreasonable explanations for her actions—she withdrew B.C. from the first school because the commute was too long, from the second because a spot opened up at the third that she thought would be better for him, and from the third because she had some concern about bullying and because in her estimation he worked better in "one-on-one sessions." And she contacted OSSE thereafter to get permission to homeschool B.C., as she had done the year prior, and followed the agency's instructions. None of this evidence indicates that any mental incapacity had a causal connection to B.C.'s educational neglect, and the government never argued otherwise. Instead, the government conceded in rebuttal that it was "not sure of" "[t]he reason" for C.P.'s educational decisions for B.C.

The associate judge's conclusion that B.C.'s "numerous excused and unexcused absences" from school were "*presumably* at least in part due to some of" his appointments to address his "imaginary facial swelling" is problematic for multiple reasons. First, B.C.'s facial swelling was not "imaginary." Second, as the

magistrate judge found, the allegation that C.P. had sought unnecessary treatment for B.C. was unsubstantiated. And third, the associate judge provided no basis, and we discern none, for her determination that B.C. missed school to go to the doctor.[14]

Likewise, the associate judge's finding that C.P. opted to homeschool B.C. because she did not want to leave him in the care of third parties had no foundation. No witness ever attributed that rationale for homeschooling to C.P., and she never testified to that effect. Nor can we conclude there was a reasonable basis for the court to draw this inference either from Mr. Date's testimony that C.P. was unwilling to let B.C. be alone with him—a perceived adversary in the neglect process—or from his testimony about C.P.'s actions at a January court hearing when B.C. was removed from C.P.'s custody. The government presented no evidence at the neglect trial that C.P. would not leave B.C. in the care of third parties, "even in the hallway of the courthouse," as the associate judge found. Mr. Date simply testified that C.P. had failed to make arrangements for someone to watch B.C., that the hearing was delayed "until some professional could watch him," and that C.P. had to leave the

---

[14] Although the magistrate judge found that C.P. often dropped B.C. off late or picked him up early at school because of her "lack of trust in others and inability to have [B.C.] outside her sight," we see no evidence in the record supporting this finding either.

courtroom several times because B.C. was being disruptive. Mr. Date was unable to say whether C.P. was willing to leave B.C. with someone else on that day.

Lastly, the associate judge's conclusion that C.P.'s mental incapacity "precluded her from recognizing her own inadequacies as a home schooling teacher" is also unsubstantiated. Other than the fact that C.P. sought to homeschool B.C., there is no evidence about what C.P. thought at the time of her own abilities as a homeschooling teacher. Without more, her decision to homeschool him in 2018 cannot be attributed to mental incapacity, especially when OSSE had authorized her to homeschool him in 2017. Moreover, C.P. subsequently acknowledged at the neglect trial that she could see now that she had not made the best choices for B.C. vis-a-vis his education.[15]

---

[15] Citing to C.P.'s "admissions" that "she had made bad decisions" about B.C's schooling and her inability to describe with precision the content of her homeschooling instruction, the government argues that there is sufficient evidence of nexus between C.P.'s mental incapacity and her educational neglect of B.C. But as explained above, mental incapacity is more than bad judgment, and the government's nexus argument on appeal appears premised on a theory of cognitive impairment as mental incapacity, which the government never argued or proved at the neglect trial.

For all these reasons, we conclude that there was insufficient evidence to support the associate judge's affirmance of the magistrate judge's determination of mental incapacity neglect pursuant to D.C. Code 16-2301(9)(A)(iii).

### III. Conclusion

Based on the above analysis, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*